**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0286n.06
Filed: May 22, 2008

No. 07-1391

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| EBI-DETROIT, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CITY OF DETROIT, DETROIT WATER AND | ) | COURT FOR THE EASTERN |
| SEWER DEPARTMENT, GARY FUJITA, | ) | DISTRICT OF MICHIGAN |
| VICTOR MERCADO, KWAME KILPATRICK, | ) | |
| individually and in his capacity as MAYOR OF | ) | |
| DETROIT, | ) | |
| | ) | |
| Defendants-Appellees. | | |

Before:     BOGGS, Chief Judge; ROGERS, Circuit Judge; and SHADUR,[*] District Judge

BOGGS, Chief Judge. Construction contractor EBI-Detroit appeals the district court's grant of summary judgment in favor of the City of Detroit, the Detroit Water and Sewer Department ("DWSD"), Gary Fujita and Victor Mercado, two directors of DWSD, and Detroit's mayor, Kwame Kilpatrick. EBI claims that the defendants breached a contract and committed various intentional torts when they rejected EBI's bid on a DWSD project. The threshold question in this case is whether federal jurisdiction exists. We conclude that it does. EBI's allegation that Kilpatrick acted outside the powers granted to him by a federal court requires us to interpret the federal court order

---

[*]The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

and thus presents a federal question. The second, easier question is whether EBI's claims can survive summary judgment. We conclude that they cannot, and therefore affirm.

I

Our jurisdiction turns on Kilpatrick's appointment as "Special Administrator" of DWSD under a consent decree between DWSD and the EPA, so we summarize the extended litigation between those two parties. Thirty-one years ago, in 1977, the United States sued DWSD over DWSD's noncompliance with the Clean Water Act ("EPA Case"). In September 1977, the parties entered a consent decree establishing a compliance schedule for bringing DWSD's wastewater treatment and pollution discharges in line with the Clean Water Act. District Judge Feikens oversaw the initial consent decree, and he has continued to oversee the litigation surrounding DWSD and the EPA to this day. In 1979, Judge Feikens found that DWSD was not following the compliance schedule and appointed Coleman Young, the mayor of Detroit, as "Special Administrator" of the DWSD. *United States v. City of Detroit*, 476 F. Supp. 512 (E.D. Mich. 1979). This appointment gave the mayor power to "exercise extraordinary remedies in control, management, and operation of the Wastewater Treatment Plant" to ensure DWSD's compliance, *id.* at 515, and allowed him "to enter into such contracts as he deems necessary and appropriate under the circumstances, with or without competitive bidding." *Id.* at 516.

Since the initial consent decree, DWSD has drifted in and out of compliance with the Clean Water Act. During periods of compliance, Judge Feikens "temporarily suspended the Special Administratorship," only to "revive" it when "compliance with the Clean Water Act or the Consent Judgments in this case was at risk." *United States v. Michigan*, 409 F. Supp. 2d 883, 886 (E.D.

Mich. 2006) (Feikens, J.). In August 1997, DWSD acknowledged that it was once again operating in violation of EPA regulations. Judge Feikens appointed a committee to investigate DWSD's non-compliance. The committee issued its report in January 2000, and the court again responded by appointing Detroit's mayor, Dennis Archer, as Special Administrator of DWSD. The court gave Archer the same powers it gave to Mayor Young in 1979. *United States v. City of Detroit*, No. 77-71100, 2000 WL 371795 (E.D. Mich. Feb. 7, 2000). DWSD's contracts were "subject to the requirement of competitive bidding," but the mayor could waive the bidding rules when he deemed it "necessary." *Id.* at * 5. On December 3, 2001, the court transferred the authority of the Special Administrator to Detroit's new mayor, Kwame Kilpatrick.

This case arises from DWSD's rejection of EBI's bid on Contract PC-753, the Belle Isle Pump Station and Combined Sewer Overflow Control Improvements Project (the "Belle Isle Project"). The parties agree that the Belle Isle Project is required by DWSD's EPA permit. DWSD's Assistant Director Gary Fujita stated that the Belle Isle Project needed to be completed on a tight timetable to ensure compliance with the EPA's consent decree. DWSD solicited bids on the Belle Isle Project, and, after equalization, the two lowest bids came from EBI, at $13,265,009, and from Walsh Construction, at $13,588,680.[1]

---

[1] "Bid equalization" is a process that allows a government body to give preference to bidders with certain characteristics by adjusting the bidder's bid according to an equalization table. DWSD gives bidders an "equalization allowance" of between 1% and 5%, depending on the contract size, to Detroit-based businesses or to small businesses. *See Walsh Constr. Co. of Ill. v. City of Detroit*, 257 F. Supp. 2d 935, 938 (E.D. Mich. 2003) (discussing Detroit's equalization process).

DWSD made it clear that the Belle Isle Project would be awarded to the lowest bidder who was both *responsive* and *responsible*, "responsive" meaning that the bidder submitted a timely bid that conformed to DWSD's request, and "responsible" meaning that the bidder's record suggested that it could be expected to complete the project on time and in compliance with all relevant laws. DWSD sent EBI a letter on January 28, 2005, telling EBI that it was the lowest responsive bidder and that it needed to submit certain documents to prove that it was responsible. On February 4, 2005, EBI attended a bid evaluation meeting where EBI and DWSD discussed the items that EBI needed to submit. On March 21, 2005, DWSD's director, Victor Mercado, sent EBI a letter stating that due to EBI's deficient performance on an earlier project, the LH-391 Project, DWSD was deeming EBI a non-responsible bidder and awarding the contract to another bidder.

The LH-391 Project was also required by the consent decree, and EBI was the design/build contractor for that project. While the LH-391 Project is not at issue in this case, it is relevant because EBI's performance on it prompted DWSD to reject EBI's bid on the Belle Isle Project. Both parties agree that serious problems arose on the LH-391 Project. It was supposed to be substantially completed by June 21, 2004, but was not substantially completed until July 2005. As expected, EBI and the defendants disagree over the source of the problems. EBI devotes three pages of its brief to explaining how the defendants falsely blamed EBI for problems that they created. The Defendants counter by pointing the finger at EBI. They also argue that because EBI has already sued DWSD in state court over the LH-391 Project, it should not be allowed to litigate the LH-391 Project in this case as well.

EBI responded to the rejection of its bid on the Belle Isle Project on March 29, 2005, by sending a letter claiming that the decision was unfair and requesting a protest hearing. Sections 13.2 and 13.3 of the bidding document state that if a bid is rejected, the bidder may file a protest, and DWSD will review the protest and "if necessary" hold a hearing on the matter within ten days. DWSD sent EBI a letter on April 19 pointing out the permissive nature of its hearing obligations and informing EBI that DWSD had determined that a hearing was not necessary. Instead, on June 9 Kilpatrick invoked his powers as Special Administrator of DWSD and awarded the contract to Walsh Construction.

EBI sued the defendants on September 25, 2006, in Wayne County Circuit Court, asserting claims for breach of contract, defamation, tortious interference, and "abuse of power by the Special Administrator" against Kilpatrick. On October 11, 2006, the defendants removed the case to federal court. The case was initially assigned to Judge Paul Gadola, but it was reassigned on November 1, 2006, to Judge Feikens in light of his role in overseeing DWSD. EBI filed a motion to remand the case to state court on October 30, but it was denied on December 6.

The defendants filed a motion for summary judgment on December 27, and on April 25, 2007, the district court granted the motion. Judge Feikens reasoned that EBI was merely a disappointed bidder and lacked standing to assert any of its claims. EBI appealed.

II

A

The first question in this case is whether we have subject matter jurisdiction, an issue we review de novo. *Taveras v. Taveraz*, 477 F.3d 767, 771 (6th Cir. 2007).

B

The bedrock principle of the federal judicial system is that federal courts are courts of limited jurisdiction. For a federal court to have jurisdiction over a case, "[t]he Constitution must have given to the court the capacity to take it, and an act of Congress must have supplied it." *Finley v. United States*, 490 U.S. 545, 548 (2003) (quoting *Mayor v. Cooper*, 6 Wall 247, 252 (1868)). Generally speaking, the Constitution and Congress have given federal courts authority to hear a case only when the case raises a federal question or when diversity of citizenship exists between the parties. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). The federal question must appear on the face of the plaintiff's well-pleaded complaint. *Ibid.; see also Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 150 (1908). When a case raising a federal question is filed in state court, the defendant may remove it to federal court if the case could have been filed in federal court. *Caterpillar Inc.*, 482 U.S. at 392. Thus, a plaintiff may avoid federal question jurisdiction by relying exclusively on state law. *Ibid*. EBI argues that it did so and that its complaint relies solely on state law.

The defendants counter by invoking 28 U.S.C. § 1442, which allows federal officers who are civilly sued or criminally prosecuted for actions taken "under color" of their office to remove the case to federal court even if no federal question appears on the face of the plaintiff's complaint. *Mesa v. California*, 489 U.S. 121, 125–26 (1989). *Mesa* explained that removal under § 1442(a) is proper when: 1) the defendant is a federal officer within the meaning of the statute; 2) there is a causal connection between what the officer has done under asserted federal authority and the state lawsuit; and 3) the officer presents a colorable defense arising from his duty to enforce federal law.

*Mesa*, 489 U.S. at 132–33. The defendants say that federal jurisdiction exists under § 1442(a) because: 1) Kilpatrick is "an officer of the courts of the United States" because of his federally-appointed position as Special Administrator; 2) a causal connection exists because he is being sued for an action that the Special Administrator may take; and 3) he has a federal defense because as Special Administrator, he may circumvent the bidding process to enforce the consent decree.

It seems likely that Kilpatrick is a "federal officer" because of his appointment as Special Administrator and that he has "a colorable federal defense" because of his powers as Special Administrator. However, we question the defendants' ability to establish a "causal connection" between Kilpatrick's actions under federal authority and the lawsuit. Other courts have considered § 1442(a) in the context of a state official's attempted compliance with a federal consent decree or court order, and they have held that the state official establishes the necessary "causal connection," and is transformed into a "federal officer," only when his actions are "explicitly mandated or necessarily required" by the court order or consent decree with which he seeks to comply. *See, e.g.*, *In re County Collector of the County of Winnebago, Ill.*, 96 F.3d 890, 898 (7th Cir. 1996). It is not clear that Kilpatrick's actions were "explicitly mandated" or "necessarily required" by the consent decree. But we need not resolve this issue because even if the defendants cannot establish federal

jurisdiction through the somewhat unusual means of Kilpatrick's status as a "federal officer,"[2] EBI's own complaint establishes routine federal question jurisdiction under 28 U.S.C. § 1331.

C

Section 1331 creates federal jurisdiction for all lawsuits "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In turn, 28 U.S.C. § 1441(b) allows a defendant to remove such a case to federal court. The "laws" of the United States include the orders issued by the federal courts. In the vast majority of cases, a claim "arises under" federal law when federal law provides a right to relief. *Eastman v. Marine Mech. Corp.*, 438 F.3d 544, 550 (6th Cir. 2006) (citing *Am.Well Works Co. v. Layne & Bowler Co.* 241 U.S. 257, 260 (1916)). Federal law provides EBI's right to relief here because EBI's complaint alleges that Kilpatrick violated the federal court order appointing him Special Administrator of the DWSD.

EBI's allegation that Kilpatrick violated federal law appears on the face of EBI's complaint. The complaint states that:

> 99. Mr. Kilpatrick's actions awarding the Project to another contractor without seeking approval of the City Council *constituted a violation of his powers as Special Master* [Administrator].

> 100. Such disregard by the Mayor of Detroit constitutes an improper use of enumerated powers and as such *Mr. Kilpatrick's actions are ultra vires*.

---

[2] For additional illustrations of when a state official can invoke federal officer jurisdiction under § 1442(a), compare *Tucker v. Cleveland Bd. of Educ.*, 465 F. Supp. 687, 689 (N.D. Ohio 1979) (no federal officer jurisdiction because defendants "undertook these actions of [their] own volition, albeit as a response to this Court's orders") with *Voinovich v. Cleveland Bd. of Educ.*, 539 F. Supp. 1100, 1102 (N.D. Ohio 1982) (federal officer jurisdiction because the court had "directly ordered" the Board's actions as part of desegregation consent decree).

. . .

107. Mayor Kilpatrick's actions awarding the Project contract to another contractor without consulting the City Council *violated his powers as Special Master* [Administrator].

. . .

116. Mr. Kilpatrick's actions *abused the Special Master* [Administrator] *power granted by Judge Feikens because the awarding of this Project is outside the boundaries of Mr. Kilpatrick's power* and contrary to the provisions of the Contract Documents (emphases added).

EBI even labels count 14 of its complaint "Willful Violation and Abuse of Power as Special Master of DWSD." Therefore, EBI's "right to relief" against Kilpatrick turns on whether Kilpatrick exceeded the authority granted to him by the federal court order. The order was issued by a federal court, and therefore the interpretation of that order is a question of federal law. EBI cannot recover under count 14 of its complaint unless Kilpatrick violated federal law, so we have a classic federal question and therefore subject matter jurisdiction.

EBI attempts to avoid jurisdiction in two ways. First, at oral argument, its counsel asked us to look to the "substance" of EBI's complaint and find no federal jurisdiction. This is an ambiguous request. If EBI means that we should look at the words of EBI's complaint and see what legal violations are alleged, that is what we are doing. EBI alleged in count 14 that Kilpatrick *broke federal law* by exceeding his powers as Special Administrator, and it is this substantive legal allegation that creates jurisdiction. But if EBI means that we should find no jurisdiction because most of its claims are state-law claims, we reject this suggestion because when a complaint raises a single federal question, federal courts have jurisdiction over "all other claims that are so related

to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). EBI primarily raised state-law claims, but EBI's allegation that Kilpatrick broke federal law brings the entire case into federal court because all of EBI's claims are part of the same "case or controversy."

Second, EBI points to a forum-selection clause in the bidding documents. The clause states:

> 15.4.1  The Contractor [EBI] agrees to submit to the exclusive personal jurisdiction of, and not commence any action in other than, a competent State court in Michigan, regardless of residence or domicile, for any action or suit in law or equity arising out of or under the Contract Documents.

The clause is irrelevant because it says nothing about the defendants' right to remove. Indeed, it does not mention any of the defendants at all. Our circuit has held that any waiver of the right to remove must be "clear and unequivocal." *Regis Ass'n. v. Rank Hotels Ltd.*, 894 F.2d 193, 195 (6th Cir. 1990). A clause that does not even mention either removal or the party seeking to remove cannot be a clear waiver of removal.[3]

EBI wants to be in state court, but that desire is not enough to avoid federal jurisdiction. While as the plaintiff EBI enjoys the long-established right to "decide what law he will rely upon,"

---

[3] EBI relies on *Global Satellite Commc'n Co. v. Starmill U.K. Ltd,*. 378 F.3d 1269 (11th Cir. 2004) and *Fluidtech, Inc. v. Gemu Valves, Inc.*, 457 F. Supp. 2d 763 (E.D. Mich. 2006), but neither case is persuasive. *Global Satellite* is not persuasive because that court held that waiver of the right to remove need not be unequivocal and clear, but nevertheless held that a clause stating that the parties agreed to "submit to the jurisdiction of Broward County, Florida," did not waive the defendant's right to remove the case. *Global Satellite*, 378 F.3d at 1271–72. *Fluidtech* is even less on point because it dealt with venue and never mentioned removal. A more relevant case is *City of New Orleans v. Mun. Admin. Servs., Inc.*, 376 F.3d 501 (5th Cir. 2004), which held that a clause similar to the one here was not a clear waiver of the right to remove. *Id.* at 505.

*Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913), that right does not allow EBI to escape the consequences of claiming that the defendants violated a federal court order. In another context we observed that "[n]othing prevents a plaintiff from pleading itself out of court, which is all that happened here." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 458 (6th Cir. 2007) (en banc). The reverse is also true. Nothing prevents a plaintiff from inadvertently pleading so as to subject itself to removal *into* federal court, and that is what happened here.

III

A

Having found jurisdiction, we turn now to the merits of EBI's case. The district court granted summary judgment to the defendants. We review grants of summary judgment de novo under the familiar standard of Federal Rule of Civil Procedure 56 and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 521 (6th Cir. 2008).

B

Count 1 of EBI's complaint alleges that DWSD breached a contract with EBI. But despite its best efforts, EBI cannot hide the fact that *it never signed a contract with DWSD*. Indeed, this dispute is in court precisely because Walsh Construction, not EBI, received the contract. The letter informing EBI that it was the lowest bidder told EBI that no contract had yet been awarded and that EBI would receive the contract only if it were found to be "responsible."

EBI knows this. In a letter to Kilpatrick on April 7, 2005, EBI spoke of "delays in formally awarding the contract to EBI." EBI's president admitted in his affidavit that EBI never received the contract. EBI's brief on appeal argues that "while it had not yet been finalized, all other necessary

requirements for the formation of a contract had taken place." But this is like saying that while a plaintiff has not yet filed his complaint, all other necessary requirements for the commencement of a lawsuit have taken place. Without a contract to breach, EBI's breach of contract claim cannot stand.

EBI seeks to avoid this inconvenient fact by re-framing its claim. At oral argument before the district court, EBI's counsel contended that the parties' agreement "was not a contract to give us the job . . . ; it was a contract to abide by the terms of the proposal." EBI insists that the parties agreed to abide by the bidding document, and that the defendants violated the bidding document by not holding a hearing on EBI's protest, and by not allowing EBI the opportunity to be heard at a DWSD board meeting. A glance at the bidding document disposes of EBI's first contention because the bidding document says that DWSD alone decides whether to hold a hearing. The second contention requires more consideration because while the bidding document states that a disappointed bidder who files a protest "will be given an opportunity to be heard at the Board meeting," no Board meeting was held. But EBI still loses because disappointed bidders have no standing to bring claims based on a violation of bidding procedures.

We reviewed the law surrounding standing and disappointed bidders in *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286 (6th Cir. 2006). *Club Italia* held that absent a statutory exception, "a disappointed bidder does not have standing before this court." *Id.* at 293. Cases prior to *Club Italia* consistently refused to allow disappointed bidders[4] to bring claims

---

[4] Our cases generally call a bidder who sues after having his bid rejected by the government a "disappointed bidder" regardless of the basis on which the government rejected the bid. *See, e.g.,*

for violations of the bidding procedures. *See, e.g.*, *Expert Masonry, Inc. v. Boone County, Kentucky*, 440 F. 3d 336, 348 (6th Cir. 2006) (disappointed bidder suffered no cognizable antitrust injury); *Leo J. Brielmaier Co. v. Newport Housing Auth.*, 173 F.3d 855 (table), 1999 WL 236193, at *5 (6th Cir. 1999) (disappointed bidder lacked standing to assert constitutional due process claim); *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992) (per curiam) (disappointed bidder lacked standing). A bidder who, in addition to seeing his bid rejected, is disqualified from bidding on *future* projects may have standing, *Club Italia*, 470 F.3d at 297, *United of Omaha*, 960 F.2d at 34, but EBI cannot obtain standing this way because EBI was not disqualified from bidding on future projects.

EBI's contract claim would fare no better in state court. Michigan courts hold that:

> [O]ne who is unsuccessful in bidding on a public contract does not have standing to challenge the result or the bidding process itself. This rule is based on the belief that statutes or ordinances requiring such bidding procedures for public contracts were adopted to benefit taxpayers or the general public.

*WDG Inv. Co., LLC v. Mich. Dept. of Mgmnt. and Budget*, Case No. 229950, 2002 WL 31424731, at *3 (Mich. Ct. App. 2002) (citing *Talbot Paving Co v. Detroit*, 67 N.W. 979, 980 (1896)).

---

*Club Italia*, 470 F.3d at 293. Other courts occasionally call the bidder in these situations a "disqualified" or "unsuccessful" bidder. *See, e.g.*, *In re Colony Hill Associates*, 111 F.3d 269, 273 (2d Cir. 1997). We will refer to EBI as a "disappointed" bidder to help maintain the distinction between the usual case, where the bidder has no standing and merely sees his immediate bid rejected for whatever reason, and the unusual case where the bidder may have standing because it has been *disqualified* from bidding on *future* projects. *Cf. Club Italia*, 470 F.3d at 293 (no standing for "disappointed" bidder whose bid was rejected) and *Colony Hill*, 111 F.3d at (stating that "unsuccessful" or "disqualified" bidders do not have standing, but holding that standing existed under the Bankruptcy Code) *with United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 34 (6th Cir. 1992) (per curiam) (bidder disqualified from bidding on future contracts may have standing).

*United of Omaha* is particularly fatal to EBI's claims because it held that a disappointed bidder must show that "it was actually awarded the contract at any procedural stage or that local rules limited the discretion of state officials as to whom the contract should be awarded." *United of Omaha*, 960 F.2d at 34. EBI cannot meet this test because it was never awarded the contract and because Kilpatrick has unlimited discretion in awarding contracts in order to comply with the EPA consent decree. Like the bidder in *United of Omaha*, EBI was "obviously disadvantaged" by the government's actions, *id.* at 35, but it nevertheless "retained only a unilateral hope of being awarded the contract, not a right to it." *Ibid.* A "unilateral hope" does not create standing.

C

We turn now to EBI's state-law claims for defamation and tortious interference. EBI alleged other torts in its complaint, but raises only these two on appeal. Some confusion exists as to whether EBI alleged defamation against Mercado and Fujita as individuals, against DWSD as an entity, or against both. We will give EBI the benefit of the doubt and assume that it pleaded defamation claims against Mercado, Fujita, and DWSD.

The district court's grant of summary judgment never mentioned EBI's tort claims. The district court based its decision on a disappointed bidder's lack of standing, so we must assume that the district court concluded that EBI lacked standing to raise its intentional tort claims.

We have never determined whether disappointed bidders have standing to bring intentional tort claims, as opposed to breach of contract or constitutional due process and equal protection claims. The argument against granting standing is that doing so would allow disappointed bidders to circumvent the prohibitions on claims arising from the bidding document by pleading their

contract claims as intentional tort claims. The argument for granting standing is that government agencies should not be given a free pass to commit intentional torts simply because the victim is a disappointed bidder. Some courts have addressed the issue and granted standing to disappointed bidders in intentional tort cases. *See, e.g., A-Valey Eng'rs. Inc. v. Bd. of Chosen Freeholders of County of Camden*, 106 F. Supp. 2d 711, 719 (D.N.J. 2000) (tortious interference); *United Prison Equip. Co. v. Bd. of County Comm'rs of Caroline County*, 907 F. Supp. 908, 913 (D. Md. 1995) (defamation); *Lacorte v. Hudacs*, 884 F. Supp. 64, 70 (N.D.N.Y. 1995) (defamation). Likewise, an unpublished case from our circuit assumed that a disappointed bidder had standing to raise a tortious interference claim. *Leo J. Brielmaier Co.*, 1999 WL 236193 at *7. But we need not definitively answer the standing question now, because even if EBI has standing, its claims fail.

1

First, all defendants may be entitled to governmental immunity. We say "may" because while it is clear that DWSD and the City of Detroit, as government agencies engaged in a government function, are entitled to absolute immunity, confusion exists among Michigan courts about whether Michigan's governmental immunity statute covers intentional torts by government employees. The Michigan Supreme Court squarely held that there is "no intentional tort exception to the governmental immunity statute." *Smith v. Dept. of Pub. Health*, 410 N.W.2d 749, 772 (Mich. 1987). *Smith* has not been overruled and has been repeatedly cited by lower Michigan courts as holding that governmental immunity bars intentional tort claims against both government agencies and government employees. *See, e.g., Bell v. Fox*, 522 N.W.2d 869, 871 (Mich. Ct. App. 1994)

(relying on *Smith* to grant immunity to police officers); *Flones v. Dalman*, 502 N.W.2d 725, 731 (Mich. Ct. App. 1993) (same).

Unfortunately, the picture gets more complicated, particularly with respect to lower-level government employees. Several panels of the Michigan Court of Appeals have interpreted *Smith* as holding that governmental immunity shields only state agencies, not state officers, from tort liability. *See, e.g.*, *May v. Greiner*, 2006 WL 2987709, at *3 (Mich. Ct. App. 2006) (per curiam) (stating that *Smith* shields only government agencies, not individual government officers, from intentional tort liability); *Sudul v. City of Hamtrack*, 562 N.W.2d 478, 479 (Mich. Ct. App. 1997) (holding that "an individual employee's intentional torts are not shielded by our governmental immunity statute"); *see also ibid.* at 489–90 (Murphy, P.J., concurring in part and dissenting in part) (saying that *Smith* is responsible for the confusion and arguing that "an analysis of *Smith* beyond the bare holding reveals" that governmental immunity does not apply to intentional torts committed by police officers).

As a federal court, we look to the Michigan Supreme Court for the authoritative interpretation of Michigan law. *United States v. Philip*, 460 F.3d 729, 732 (6th Cir. 2006). *Smith* is a Michigan Supreme Court decision that has not been overruled and as such we are we are bound by it. Yet it is difficult to ignore the uncertainty created by *Smith* and the contradictory interpretations of *Smith* by the Michigan Court of Appeals as we attempt to interpret Michigan law correctly without intruding on the Michigan courts' prerogative to interpret Michigan law. Clarification from the Michigan Supreme Court would be helpful, and we are grateful that it appears to be forthcoming.

In January of this year, the Michigan Supreme Court initially declined to hear a case that could have cleared this confusion. *Odom v. Wayne County*, 743 N.W.2d 56, 57 (Mich. 2008), *reconsideration granted, order vacated by* _ N.W.2d _, 2008 WL 1851282, at *1, (Mich. April 25, 2008). Justice Markman dissented from the initial denial, pointing out the contradictory opinions within the Michigan Court of Appeals, and explaining that "[b]ecause the law in this area is in such disarray, I would grant leave to appeal." *Id.* at 57. Just before this opinion was issued, the Michigan Supreme Court vacated its denial of leave to appeal in *Odom*, granted leave to appeal, and asked for briefing on the scope of Michigan's governmental immunity statute. *Odom v. Wayne County*, _ N.W.2d _, 2008 WL 1851282, at *1, (Mich. April 25, 2008). Fortunately, we need not wait until *Odom* clears up this issue to decide this case because even if governmental immunity does not bar EBI's claims, the claims lack merit.

With that background, we turn to the immunity issue, where we consider first the question of absolute immunity with respect to DWSD and the City of Detroit. Although the defendants did not raise the issue of governmental immunity below, we may affirm if a district court's decision was correct for any reason, even if the reason was "not considered below." *United States Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 330 F.3d 747, 750 (6th Cir. 2003); *see also Mack v. City of Detroit*, 649 N.W.2d 47, 53 (Mich. 2000) (defendant's failure to raise governmental immunity defense at trial did not preclude court from considering the defense on appeal). Under Michigan law, governmental immunity is not an affirmative defense, but a characteristic of the government that bars tort liability unless an exception applies. *Mack*, 649 N.W.2d at 53–54. "A governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a

governmental function." *Ibid.* (citing Mich. Comp. Laws 691.1407(1)). A "'[g]overnmental function' is an activity that is expressly or impliedly mandated or authorized by constitution, statute, local charter or ordinance, or other law." *Ibid.* The Michigan Constitution expressly authorizes cities to maintain water systems like DWSD. Mich. Const. art. 7, § 24. Furthermore, the Michigan Court of Appeals has explicitly held that Detroit's operation of DWSD is a governmental function. *Davis v. Detroit*, 711 N.W.2d 462, 465 (Mich. Ct. App. 2006). Thus, DWSD and the City of Detroit are immune from EBI's tort claims. This immunity is indisputable. All Michigan cases agree that government agencies are immune from liability for intentional torts; the conflict is over the immunity of government officers. *See Sudul*, 562 N.W.2d at 490.

Next, we ask if the individual defendants are entitled to absolute immunity. We answer that under our understanding of Michigan law, Mayor Kilpatrick and Director Mercado are absolutely immune from EBI's tort claims. Michigan's governmental immunity statute says that "the elective or highest appointive executive official of all levels of government are immune from tort liability for injuries to persons or damages to property if he or she is acting within the scope of his or her judicial, legislative, or executive authority." Mich. Comp. Laws 691.1407(5). Michigan courts have determined that Mayor Kilpatrick and Director Mercado are covered by this law. *Brown v. Mayor of Detroit*, 723 N.W.2d 464, 481–82 (Mich. Ct. App. 2006) (vacated in part on other grounds by *Brown v. Mayor of Detroit*, 734 N.W.2d 514 (Mich. 2007)) (Kilpatrick); *Davis*, 711 N.W.2d at 466 (Mercado).

When a government official covered by MCL 691.1405(5) is acting within the scope of his authority, that official enjoys absolute tort immunity. *Am. Transmissions, Inc. v. Attorney Gen.*, 560

N.W.2d 50, 52 (Mich. 1997). The official's motivation is irrelevant; the only question is whether

the act was within the scope of his authority. *Id.* at 53 (no "malevolent-heart" exception to statute).

Awarding contracts and determining whether or not a contractor is "responsible" lie within

Kilpatrick's and Mercado's authority, so they are immune from suit. Indeed, both *Brown* and *Davis*

granted Mercado and Kilpatrick immunity from intentional tort claims pursuant to Mich. Comp.

Laws 691.1407(5) and did not mention *Smith*. This suggests to us that as the highest officials of

their respective levels of government, their right to immunity is absolute and does not turn on the

contradictory interpretations of *Smith*.[5]

Whether Deputy Director Fujita also enjoys immunity is closer question. As the *Deputy*

Director, he is not the *highest* official at his level of government. While some Michigan courts have

been willing to expand absolute immunity to Deputy Directors, others have not. *Compare, e.g.*,

*Chivas v. Koehler*, 453 N.W.2d 264, 265 (Mich. Ct. App. 1990) (granting immunity to both Director

and Deputy Director of the Department of Corrections) *with Taylor v. Bomar-Parker*, 2003 WL

21978753, at *2 (Mich. Ct. App. 2003) (stating that trial court granted summary judgment based on

absolute immunity to Director, but not to Deputy Director, of Department of Transportation). Given

this split in authority, we hesitate to speculate on how the Michigan Supreme Court would rule on

---

[5]We note, as additional reasons for our understanding of Michigan law, that the cases which disagree over *Smith* deal with the immunity of lower-level government employees and that the Michigan Supreme Court's grant of leave to appeal in *Odom* asked whether "intentional torts claims be brought under MCL 691.1407(2)," which grants qualified immunity, and not Mich. Comp. Laws 691.1407(5), which applies to Mercado and Kilpatrick. *Odom*, 2008 WL 1851282, at *1. If we are wrong, we welcome correction by the Michigan Supreme Court in *Odom* and add that the outcome of this case would not change because, as we explain later, EBI's claims lack merit.

Deputy Director Fujita's request for absolute immunity. And given that Michigan law concerning

the liability of lower-level governmental employees for intentional torts will remain unclear until the

Michigan Supreme Court rules in *Odom*, we hesitate to speculate on his request for qualified

immunity under Mich. Comp. Laws 691.1407(2).

2

Fortunately, we need not decide these questions because we hold that even if governmental

immunity does not protect one or all of the individual defendants, EBI's tort claims lack merit. EBI

claims that Mercado and Fujita defamed EBI by declaring that EBI was "non-responsible" based on

its performance on the LH-391 Project, and by communicating that declaration of non-responsibility

to other area contractors. It alleges that this statement was "knowingly false" because Mercado and

Fujita knew that DWSD, not EBI, was responsible for the problems with the LH-391 Project.

Under Michigan law, "[t]he elements of a defamation claim are: (1) a false and defamatory

statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault

amounting at least to negligence on the part of the publisher, and (4) either actionability of the

statement irrespective of special harm (defamation per se) or the existence of special harm caused

by publication." *Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005). EBI cannot prove the

second element. Defamation requires an unprivileged communication, but the only communication

EBI points to is the letter notifying the other bidders that EBI was non-responsible. This

communication was privileged because EBI consented to this communication by submitting a bid

under bidding documents that plainly stated that if a bidder was disqualified, both the

disqualification and the reasons for the disqualification would be sent to other bidders. *See Merritt*

*v. Detroit Mem'l Hosp.*, 265 N.W.2d 124, 127 (Mich. Ct. App. 1978) (statements consented to are privileged).

EBI also claims that Mercado and Fujita tortiously interfered with EBI's business relationship with DWSD. Under Michigan law, the elements of a tortious interference claim are: "(1) [t]he existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy by the interferer, (3) an intentional and wrongful interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the party whose relationship or expectancy was disrupted." *PT Today, Inc. v. Comm'r of the Office of Fin. & Ins. Servs.*, 715 N.W.2d 398, 422 (Mich. Ct. App. 2006).

EBI claims that it had a "valid promissory relationship" with DWSD, and that defendants Mercado and Fujita interfered with this relationship. The court cannot find a single legal authority that even contains the phrase "valid promissory relationship," let alone one that defines the phrase or says that a "valid promissory relationship" can form the basis of a tortious interference claim. But however one describes EBI's relationship with DWSD, it is not the kind of relationship that can support a tortious interference claim. Michigan courts have already rejected the idea that a disappointed bidder has a valid business expectancy in a potential government contract. *Timmons v. Bone*, 2002 WL 745089, at *2 (Mich. Ct. App. April 3, 2002). We agree, and note that holding otherwise would give any low responsive bidder an immediate business expectancy in the government contract at issue. EBI had a "unilateral hope" of winning the contract, nothing more, so its tortious interference claim cannot proceed. *United of Omaha*, 960 F.2d at 35; *see also NBT Bancorp, Inc. v. Fleet/Norstar Fin. Group, Inc.*, 664 N.E.2d 492, 497 (N.Y.1996) (disappointed

bidder in merger could not bring tortious interference suit because it had only an expectation of contractual relations).

D

Finally, we come to EBI's contention that Kilpatrick exceeded his powers as Special Administrator of the DWSD. As mentioned earlier, Judge Feikens's order appointing Kilpatrick Special Administrator of the DWSD gave Kilpatrick control over the "entering into and performance of all contractual obligations of the system related to the wastewater treatment plant." *United States v. City of Detroit*, 2000 WL 371795 at * 5. The same order gave Kilpatrick power to "waive" the competitive bidding requirements if he deemed it "necessary." *Ibid.*

When Kilpatrick authorized Mercado and DWSD to award the Belle Isle Project to Walsh Construction instead of EBI, Kilpatrick specifically invoked this power and explained that the order was necessary to "ensure that DWSD complies" with the consent decree. Nevertheless, count 14 of EBI's complaint protests that awarding the Belle Isle Project was "outside the boundaries of Mr. Kilpatrick's power." The protest is futile because the federal court order explicitly allows the Special Administrator to award the contract. EBI also complains that Kilpatrick never responded in writing to EBI's protest letter and that Kilpatrick never sought approval from the Detroit City Council when he short-circuited the bidding procedures. These complaints are irrelevant because nothing in the order appointing Kilpatrick Special Administrator requires him to seek the City Council's approval when awarding contracts, *cf. United States v. City of Detroit*, 2000 WL 371795 at *2 (stating that Special Administrator may exercise "all functions and powers of the Detroit City Council"), or to respond personally to every protest letter. Indeed, it is worth noting that if the

- 22 -

Special Administrator is authorized to waive competitive bidding altogether, he is certainly authorized to waive EBI's right to appeal the denial of its bid to DWSD's Board.

IV

EBI raises, for the first time on appeal, an argument that Judge Feikens should have recused himself from hearing this case. We have little difficulty rejecting this contention. EBI bases its argument on 28 U.S.C. § 455, which states that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
>
> (b) He shall also disqualify himself in the following circumstances:
>
> > (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;
> >
> > . . .
> >
> > (5) He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
> >
> > (i) Is a party to the proceeding, or an officer, director, or trustee of a party.

28 U.S.C. § 455. EBI points to Judge Feikens's longstanding role in overseeing the consent decree between DWSD and the EPA. It claims that Judge Feikens is the "de facto chief executive officer" of DWSD, and therefore he should have disqualified himself under § 455(a) because his objectivity could be reasonably questioned, and under § 455(b)(5)(i) because he is an "officer" or "director" of DWSD. But EBI offers no specific facts that would evidence bias by Judge Feikens (other than his decision against EBI) and no case suggesting that Judge Feikens should have recused himself.

We have held that "[i]n order to justify recusal under 28 U.S.C. § 455, the judge's prejudice or bias must be *personal* or *extrajudicial*." *United States v. Jamison*, 427 F.3d 394, 405 (6th Cir. 2005) (emphasis added). Here, Judge Feikens's knowledge of, and relationship with, DWSD arose solely from his judicial role in overseeing the consent decree. A judge's role in overseeing a consent decree is part of his judicial responsibilities and is not evidence of "personal" or "extrajudicial" bias. *Reed v. Rhodes*, 179 F.3d 453, 468 (6th Cir. 1999). We therefore reject EBI's argument.

V

By alleging that Kilpatrick exceeded the powers granted to him as Special Administrator, EBI pleaded itself into federal court. *Cf. NicSand*, 507 F.3d at 458. This gives our court jurisdiction, and while we cannot say whether the defendants' actions were fair or wise, we hold that they were not illegal and therefore AFFIRM the judgment of the district court.