**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0627n.06
Filed: October 17, 2008

No. 07-1973

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| WALBRIDGE ALDINGER CO., MIDWEST BUILDING SUPPLIES, INC., and JOSEPH SHELTON, | ) ) ) ) | |
| | ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| *Plaintiffs-Appellants*, | ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| | ) | **O P I N I O N** |
| CITY of DETROIT | ) ) | |
| *Defendant-Appellee*. | ) | |

BEFORE:    MOORE, COLE, Circuit Judges; and GRAHAM,[*] District Judge.

**COLE, Circuit Judge.**    Plaintiffs-Appellants Walbridge Aldinger Company, Midwest Building Supplies, Inc., and Joseph Shelton (collectively, "Plaintiffs"), filed suit in district court alleging that Defendant-Appellee City of Detroit violated the Detroit City Code § 18-5-1 et seq. by awarding a storm-sewer construction contract to D'Agostini & Sons, Inc./Lakeshore Engineering, Inc. Joint Venture. The district court granted the City of Detroit's motion for summary judgment. On appeal, the Plaintiffs challenge the district court's ruling that, as taxpayers in Detroit, they lack standing to challenge the City's decision to award the construction contract to another company. We are not convinced, however, that sufficient facts have been adduced to determine the existence of

---

[*]The Honorable James L. Graham, United States District Judge for the Southern District of Ohio, sitting by designation.

federal subject matter jurisdiction. Accordingly, we **REVERSE** the grant of summary judgment and **REMAND** the case to the district court for further proceedings consistent with this judgment.

## I. BACKGROUND

### A. Factual History

On December 29, 2006, the City of Detroit ("City") opened bidding for a contract to construct the Oakwood CSO Control Facility and Pump Station, a project that included the renovation and refurbishment of existing sanitary facilities, and the construction of a new storm and sanitary pump station. Under Detroit City Code § 18-5-1, the City is required to award a contract to the "lowest responsible bidder," a term defined as the lowest bidder who demonstrates, among other things, "[a] satisfactory record of integrity, judgment, and performance." The lowest bidder is determined after readjusting each bid by a two-percent equalization credit in one of two situations: (1) where a "Detroit-based business" submits a bid on a city contract exceeding $500,000, *id*. § 18-5-2(1)(d)(1), and (2) where a joint venture contains a business that is "Detroit-based," *id*. § 18-5-2(1)(d)(2).

The City received only two bids on the project. One bid, in the amount of $159,931,000, was submitted by Walbridge Oakwood JV ("Walbridge"), a joint venture between Midwest Building Supplies, Inc., and Walbridge Aldinger Co., a large construction company with its business headquarters in Detroit, Michigan. The other bid, in the amount of $154,507,025, was submitted by D'Agostini & Sons, Inc./Lakeshore Engineering, Inc. Joint Venture ("D'Agostini"). Both bidders claimed to be joint ventures comprised of Detroit-based or Detroit-headquartered businesses, but only Walbridge submitted a completed Detroit-based subcontractor form. And because

D'Agostini did not officially submit the required information, it did not receive the customary two-percent equalization credit and its bid remained in the amount of $154,507,025. Even with the two-percent credit, however, Walbridge's revised price was still higher than that of D'Agostini, at $156,732,380.

After reviewing the two bids, the City awarded the contract to D'Agostini. This decision marked the beginning of a contentious exchange between Walbridge and the City as to whether the City should have rejected D'Agostini's bid as defective. By letter dated March 30, 2006, Walbridge requested that the City reconsider its recommendation because D'Agostini had: (1) failed to submit a completed subcontractor form; (2) failed to provide a joint venture agreement as required; and (3) provided a defective bid bond. According to Walbridge, by the terms of the Bid Document instructions, D'Agostini's bid should have been deemed non-responsive and disqualified based on those defects.

The City responded in writing less than a week later, rejecting Walbridge's request for reconsideration and reaffirming its decision to award D'Agostini the contract. The City first explained that "'[a] minor informality or irregularity is one that is merely a matter of form and not of substance,'" and may be "'corrected or waived without being prejudicial to other bidders. The defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired.'" (Joint Appendix ("J.A.") 47) (quoting 48 C.F.R. § 14.405). The City then addressed each of Walbridge's concerns specifically. First, even though D'Agostini may not have properly submitted a subcontractor form, the City noted that such a failure was a minor defect that may be waived by the

Detroit Water & Sewerage Department ("DWSD") without being prejudicial to Walbridge. The validity of the bid bonds were, in the City's view, also considered minor deviations that DWSD likewsie could waive without being prejudicial. Finally, the City also pointed out that D'Agostini's failure to provide the required joint venture information was irrelevant because D'Agostini did not receive the two-percent equalization credit. In short, because the information missing from the bid did not give D'Agostini an unfair advantage over Walbridge, the City could waive those alleged defects.

Dissatisfied with the City's response, Walbridge again protested the City's decision to award the contract to D'Agostini. By letter dated April 9, 2007, Walbridge reiterated its concern that D'Agostini had not submitted a completed subcontractor data form, which, according to Walbridge, allowed D'Agostini "to generate a price without soliciting any bids from local subcontractors." (J.A. 50.) If Walbridge were allowed that privilege, it explained, Walbridge would have been able to generate a much lower initial bid and "shop" the numbers after the fact to find a contractor that would agree to its reduced number. Walbridge also reasserted its complaints that D'Agostini had failed to provide the proper joint venture information, that it failed to submit a proper bid bond, and that D'Agostini should not be afforded status as a Detroit-based business.

The City responded to Walbridge's second protest with much of the same—namely, that it considered the alleged defects minor and waivable. The City also rejected Walbridge's argument that the missing information from D'Agostini's bid did not put Walbridge at an unfair disadvantage, because before the bidding occurs, all bidders have the opportunity to "shop" their bids if they so choose. Thus, Walbridge and D'Agostini had the same opportunity to "shop" their bids. Most

importantly, the City noted that the original bid document states, in part, that the City "expressly reserves the right to reject any or all Bids, waive any non-conformances, to issue post-Bid addenda and re-Bid the Work without readvertising, to re-advertise for Bids, to withhold the award for any reason the Owner determines and/or to take any appropriate action." (J.A. 119, 180.)

On April 17, 2007, the City declared D'Agostini's bid to be the lower responsive bid and then requested D'Agostini to "demonstrate responsibility" by providing information on eleven scheduled items. This list of items included a bid breakdown, certification forms, a list of subcontractors, a schedule of manufacturers and supplies, and the appropriate financial information.

**B. Procedural History**

On April 19, 2007, Walbridge filed suit in the United States District Court for the Eastern District of Michigan, seeking permanent and preliminary injunctive relief preventing the award of the storm-sewer/sanitation contract to D'Agostini. Walbridge alleged that the substantial defects in D'Agostini's bid rendered the bid non-responsive, and that, because with proper equalization credits, Walbridge was the lower equalized bidder, the City's decision to award the contract to D'Agostini violated Detroit City Code § 18-5-1 et seq.

The parties agree that the district court, through a series of consent judgments, has overseen all compliance issues of the DWSD with federal and state environmental laws. The court's oversight includes reviewing the issuance of contracts concerning the building and maintenance of DWSD facilities. *Walbridge Aldinger Co. v. City of Detroit*, 495 F. Supp. 2d 642, 642 n.2 (E.D. Mich. 2007).

The City filed a motion for summary judgment, claiming that: (1) as a disappointed bidder on a public contract, Walbridge lacks standing to contest the award of a public contract; (2) Walbridge does not have standing to bring a taxpayer action under Michigan law because it cannot show that the contract award would cause any increased taxation; and (3) even if it had taxpayer standing to sue, Walbridge's claims fail on their merits. Walbridge filed a response arguing, among other things, that it has both taxpayer and retail ratepayer standing to challenge the City's contract award under Michigan law. In reply, the City countered that Walbridge lacked both taxpayer and ratepayer standing. After oral argument on the matter, the district court granted summary judgment for the City based on the ratepayer standing issue, without ruling on the taxpayer standing. *Walbridge Aldinger Co.*, 495 F. Supp. 2d 642. The court found that Walbridge "do[es] not have standing to join in disputes involving the awarding of public contracts." *Id*. at 645. "As [] retail ratepayers," the court explained, "[Walbridge is] no different than nearly every home or business in the entire region. Allowing [Walbridge] to have standing in this matter would essentially permit any individual in the region to become a party to any case regarding a contract awarded by [the City] . . . ." *Id*. Walbridge timely appealed.

## II. JURISDICTION

Walbridge, in its complaint, claimed jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337. The complaint did not assert the existence of a federal question, nor have the parties raised the issue of subject matter jurisdiction in the district court. In its order granting summary judgment to the City, the district court stated that it retains jurisdiction over contracts concerning the building and maintenance of DWSD facilities pursuant to its equitable authority to oversee the City's compliance

with a series of consent judgments, again without elaborating on the exact nature of the federal question in this case. On appeal, the City challenges this Court's subject matter jurisdiction.

Even if the City did not challenge the existence of subject matter jurisdiction, we are required to satisfy ourselves of our own jurisdiction. *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541, 546-47, 106 S. Ct. 1326, 89 L. Ed. 2d 501 (1986). Further, we must consider the issue *sua sponte* when it appears from the record that jurisdiction is lacking. *Id.* As there is no diversity of citizenship between the parties in this case, we need only examine whether the City's bid process obligations fall within the original "federal question" jurisdiction of the district court.

Federal question jurisdiction exists in "all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Supreme Court has identified three situations in which a case could "arise under" federal law: (1) if the plaintiff's cause of action is created by federal law; (2) if a party's right to relief under state law requires a resolution of a substantial question of federal law in dispute; and (3) if the claim is in substance one of federal law. *City of Warren v. City of Detroit*, 495 F.3d 282, 286 (6th Cir. 2007) (citing *Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 13, 103 S. Ct. 2841, 77 L. Ed. 2d 420 (1983)). To determine the presence or absence of federal question jurisdiction, we are governed by the well-pleaded complaint rule, which provides that such jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S. Ct. 2425, 96 L. Ed. 2d 318 (1987) (citation omitted).

The well-pleaded facts in Walbridge's complaint do not assert a claim created by federal law. Rather, in the complaint, Walbridge alleges that the City violated its own municipal code during the

bid process, resulting in the award of the contract to D'Agostini. It is on this basis that we must consider the jurisdictional issue. For such jurisdiction to exist, we must conclude that the resolution of Walbridge's state-law claims require a resolution of a substantial question of federal law.

The Supreme Court has avoided enumerating a "single, precise, all-embracing test for jurisdiction over federal issues embedded in state-law claims between nondiverse parties." *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314, 125 S. Ct. 2363, 162 L. Ed. 2d 257 (2005) (internal quotation marks and citation omitted). The relevant question is, whether on the face of a plaintiff's well-pleaded complaint, "a state-law claim necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities." *Id*. at 315. Walbridge has the burden of establishing subject matter jurisdiction. *Musson Theatrical v. Fed. Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996). Thus, it is incumbent upon Walbridge to advance the facts and theories necessary to establish subject matter jurisdiction. *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 809, n. 6, 106 S. Ct. 3229, 3233, n. 6, 92 L. Ed. 2d 650 (1986) ("Jurisdiction may not be sustained on a theory that the plaintiff has not advanced.") (citations omitted).

Walbridge gives two reasons in support of federal question jurisdiction. First, Walbridge claims that a federal question exists under 28 U.S.C. § 1331 because "the contracting practices of the City's Water & Sewerage Department fall under the ambit of the Special Administrator's responsibility by various Orders of this Court relating to *United States v. City of Detroit, Civil Action*, 77-71100." Complaint at 2, *Walbridge Aldinger Co., et al. v. City of Detroit*, 495 F. Supp.

2d 642 (No. 07-11736). Second, Walbridge claims that we have jurisdiction under 28 U.S.C. § 1361, which provides the district court with original jurisdiction over any action to compel an officer of the United States—in this case, the Special Administrator—to perform a duty owed to the plaintiffs. *Id*.

We conclude that subject matter jurisdiction may not be sustained under 28 U.S.C. § 1361. The district court terminated the position of the Special Administrator prior to the commencement of this case, *United States v. Michigan*, 409 F. Supp. 2d 883, 890 (E.D. Mich. 2006), and therefore there is no "officer of the United States" to compel. Accordingly, Walbridge may only sustain federal question jurisdiction under 28 U.S.C. § 1331.

However, given the nature and length of the litigation surrounding contracts necessary to comply with the consent decree, Walbridge has failed to meet its burden of establishing federal question jurisdiction exists. This Court recently provided a summary of the extensive litigation between the DSDW and the Environmental Protection Agency ("EPA"):

Thirty-one years ago, in 1977, the United States sued DWSD over DWSD's noncompliance with the Clean Water Act ("EPA Case"). In September 1977, the parties entered a consent decree establishing a compliance schedule for bringing DWSD's wastewater treatment and pollution discharges in line with the Clean Water Act. District Judge Feikens oversaw the initial consent decree, and he has continued to oversee the litigation surrounding DWSD and the EPA to this day. In 1979, Judge Feikens found that DWSD was not following the compliance schedule and appointed Coleman Young, the mayor of Detroit, as "Special Administrator" of the DWSD. *United States v. City of Detroit*, 476 F. Supp. 512 (E.D. Mich. 1979). This appointment gave the mayor power to "exercise extraordinary remedies in control, management, and operation of the Wastewater Treatment Plant" to ensure DWSD's compliance, *id.* at 515, and allowed him "to enter into such contracts as he deems necessary and appropriate under the circumstances, with or without competitive bidding." *Id.* at 516.

Since the initial consent decree, DWSD has drifted in and out of compliance with the Clean Water Act. During periods of compliance, Judge Feikens "temporarily suspended the Special Administratorship," only to "revive" it when "compliance with the Clean Water Act or the Consent

Judgments in this case was at risk." *United States v. Michigan*, 409 F. Supp. 2d 883, 886 (E.D. Mich. 2006) (Feikens, J.).  In August 1997, DWSD acknowledged that it was once again operating in violation of EPA regulations. Judge Feikens appointed a committee to investigate DWSD's noncompliance.  The committee issued its report in January 2000, and the court again responded by appointing Detroit's mayor, Dennis Archer, as Special Administrator of DWSD. The court gave Archer the same powers it gave to Mayor Young in 1979.  *United States v. City of Detroit*, No. 77-71100, 2000 WL 371795 (E.D. Mich.  Feb.7, 2000).  DWSD's contracts were "subject to the requirement of competitive bidding," but the mayor could waive the bidding rules when he deemed it "necessary." *Id.* at * 5.  On December 3, 2001, the court transferred the authority of the Special Administrator to Detroit's new mayor, Kwame Kilpatrick.

*EBI-Detroit, Inc. v. City of Detroit*, No. 07-1391, 2008 WL 2130472, at *1 (6th Cir.  May 22, 2008).

Moreover, at oral argument, the City's counsel made several statements that raise factual issues relating to the existence of federal question jurisdiction.  Most notably, counsel argued that this case is factually distinguishable from *City of Warren*, 495 F.3d 282, because here, unlike in *Warren*, the project under contract is necessary for the City to fulfill the requirements of federal environmental laws.  Counsel also averred that the district court could determine whether the project subject to the contract in this case is necessary for the City of Detroit to comply with the consent decree.  By virtue of its order granting summary judgment, the district court did not establish, nor have the parties on appeal developed, the extent to which the contract or bid process at issue is required by the terms of the consent decree or the district court's orders related thereto, the extent the court possesses the powers of the Special Administrator with respect to contracting and bidding decisions, and finally, whether the court oversees the bid process.  The district court should consider the allegations set forth in Walbridge's complaint, the terms of the consent decree, and  the court's role related to the consent decree and bid process to determine whether such allegations raise a substantial federal question in dispute.

Accordingly, we **REVERSE** the order granting summary judgment and **REMAND** this matter to the district court for a determination, via factual findings and conclusions of law, that federal question jurisdiction exists and for such other proceedings that are consistent with this opinion.