CEDRONI ASSOCIATES, INC v TOMBLINSON, HARBURN
ASSOCIATES, ARCHITECTS & PLANNERS, INC

Docket No. 287024. Submitted May 11, 2010, at Detroit. Decided November 16, 2010, at 9:05 a.m.

Cedroni Associates, Inc., the lowest bidder for a school construction project of the Davison Community Schools (DCS), brought an action in the Genesee Circuit Court against Tomblinson, Harburn Associates, Architects & Planners, Inc. (an architectural firm the DCS hired to assist with the bid-selection process by reviewing and evaluating bid applications, investigating competing contractors and their references, expressing opinions and views on contractor competence and workmanship, and making recommendations regarding which contractor should be awarded the project), after the DCS awarded the contract for the project to the second lowest bidder following defendant's recommendations. The court, Judith A. Fullerton, J., granted summary disposition in favor of defendant on the basis that plaintiff's claim of tortious interference with a business expectancy failed to state a claim on which relief could be granted because plaintiff lacked a valid business expectancy in being awarded the contracts. Plaintiff appealed.

The Court of Appeals *held*:

1. A genuine issue of material fact existed with respect to the elements of plaintiff's cause of action. The trial court erred as a matter of law by holding that plaintiff lacked a valid business expectancy. Plaintiff, as the lowest bidder, submitted evidence sufficient to create a factual dispute with respect to whether it was a responsible contractor to the extent that the trier of fact could have concluded that there existed a reasonable probability or likelihood that plaintiff would have been awarded the project absent the alleged tortious interference. Plaintiff submitted evidence sufficient to create a factual dispute with respect to whether defendant's conduct was intentional and improper, motivated by malice and not by legitimate business reasons.

2. The submission of the lowest bid, in and of itself, is inadequate to sustain a plaintiff's suit in such a case.

3. Although the exercise of professional business judgment in making recommendations relative to governmental contracts and

projects must be afforded some level of protection and deference, litigation will not be precluded when evidence exists suggesting that the ostensible exercise of professional business judgment was in reality a disguised attempt to intentionally and improperly interfere with the contractual or expectant business relationships of others.

4. With respect to a claim of tortious interference with a business expectancy, the plaintiff must prove (1) the existence of a valid business expectancy, (2) knowledge of the expectancy on the part of the defendant, (3) an intentional interference by the defendant inducing or causing a termination of the expectancy, and (4) resultant damage to the plaintiff.

5. The following principles apply in determining whether a valid business expectancy existed: (1) the presence of some level of discretion exercisable by a governmental body or decision-maker does not automatically preclude a recognition of a valid business expectancy, (2) if the discretion is expansive and not restricted by limiting criteria and factors to the extent that it makes it impossible to reasonably infer that the claimed expectancy would likely have come to fruition, there is no valid business expectancy, (3) an expectancy must generally be specific and reasonable, (4) it must be shown that there was a reasonable likelihood or probability that the expectant relationship would have developed as desired absent tortious interference with the expectancy, (5) a party need not prove that the expectancy equated to a certainty or guarantee, (6) innate optimism or mere hope is insufficient, and (7) the prior history of the governmental body or decision-maker and governing internal and external rules, policies, and laws constitute factors for a court to consider in determining whether a business expectancy was valid and likely achievable.

6. The provisions of the DCS's fiscal management policy and project manual that reserved the DCS's right to reject any or all bids were subject to the provision requiring an award to be made to the lowest responsible bidder. The "right to reject" provisions remained entirely enforceable in all circumstances other than the particular situation in which the bid was submitted by the lowest responsible bidder.

7. Although MCL 380.1267 provides that the DCS could reject any or all bids, it did not restrict the DCS from imposing its own criteria and limitations on itself relative to the bidding process and the acceptance and rejection of bids. Therefore, the DCS's fiscal management policy was relevant to analyzing whether plaintiff had a valid business expectancy.

8. A plaintiff alleging tortious interference with a business expectancy must demonstrate that the defendant acted both intentionally and either improperly or without justification. The plaintiff must allege the intentional doing of a wrongful act per se or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship with another. A wrongful act per se is an act that is inherently wrongful or an act that can never be justified. When a defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific affirmative acts that corroborate the unlawful purpose. To establish that a lawful act was done with malice and without justification, the plaintiff must prove with particularity affirmative actions that the defendant took that corroborate the improper motive.

9. A trier of fact, viewing the conflicting and inconsistent evidence and the inferences arising from it in a light most favorable to plaintiff, could reasonably have concluded that defendant acted with malice, in a wrongful manner per se, unethically, with an improper motive and absence of justification, or deceitfully with respect to the damaging information and recommendation conveyed to the DCS. Summary disposition was inappropriate in light of the record.

10. A genuine issue of material fact existed regarding whether the employee who conducted defendant's review of the bids before recommending that plaintiff not be awarded the project was honestly acting for the benefit of the DCS or whether she was acting solely for her own benefit and out of motivation to harm plaintiff. Therefore, summary disposition was improper.

Reversed and remanded.

K. F. KELLY, J., dissenting, stated that the trial court properly granted summary disposition in favor of defendant. Plaintiff failed to state a claim on which relief could be granted because, in recommending that the DCS reject plaintiff's bid, defendant was acting as an agent of the DCS, not an independent third party. In addition, plaintiff lacked a valid business expectancy since the DCS's decision was highly discretionary and, by statute, it had broad and unfettered discretion to reject any or all bidders. None of the bidders had any prospective advantage or business expectancy; rather, each of their interests was limited to an expectancy that the bidding process would be fair and free of fraud. Plaintiff failed to show any fraud, injustice, or violation of trust in the bidding process. Plaintiff failed to show that defendant's conduct was malicious or wrongful or that defendant's allegedly wrongful

conduct caused plaintiff to lose the award of the contract. Defendant's actions were justified as actions based on a legitimate business decision.

1. TORTS — INTERFERENCE WITH A BUSINESS EXPECTANCY — ELEMENTS.

A plaintiff seeking to litigate a claim of tortious interference with a valid business expectancy must prove (1) the existence of a valid business expectancy, (2) knowledge of the expectancy on the part of the defendant, (3) an intentional interference by the defendant inducing or causing a termination of the expectancy, and (4) resultant damage to the plaintiff; a valid business expectancy is one in which there exists a reasonable likelihood or probability that the expectancy will come to fruition.

2. TORTS — INTERFERENCE WITH A BUSINESS EXPECTANCY.

The principles to be applied in determining whether a valid business expectancy exists for purposes of determining whether a defendant tortiously interfered with that business expectancy include (1) the presence of some level of discretion exercisable by a governmental body or decision-maker does not automatically preclude a recognition of a valid business expectancy, (2) if the discretion of the governmental body or decision-maker is expansive and not restricted by limiting criteria and factors to the extent that it makes it impossible to reasonably infer that the claimed expectancy would likely have come to fruition, there is no valid business expectancy, (3) an expectancy must generally be specific and reasonable, (4) it must be shown that there was a reasonable likelihood or probability that the expectant relationship would have developed as desired absent tortious interference with the expectancy, (5) a party need not prove that the expectancy equated to a certainty or guarantee, (6) innate optimism or mere hope is insufficient, and (7) the prior history of the governmental body or decision-maker and governing internal and external rules, policies, and laws constitute factors for a court to consider in determining whether a business expectancy was valid and likely achievable.

3. SCHOOLS — CONSTRUCTION CONTRACTS — REJECTION OR ACCEPTANCE OF BIDS.

The provision of the Revised School Code regarding competitive bidding for contracts for the construction of a new school building or addition to or repair or renovation of an existing school building that provides that the board of a school district or intermediate school district or the board of directors of a public school academy may reject any or all bids does not restrict the board from imposing its own criteria and limitations on itself relative to the bidding process and the acceptance or rejection of bids (MCL 380.1267[6]).

4. TORTS — INTERFERENCE WITH A BUSINESS EXPECTANCY — WRONGFUL ACTS PER SE — LAWFUL ACTS DONE WITH MALICE AND UNJUSTIFIED IN LAW.

A plaintiff claiming tortious interference with a business expectancy must demonstrate that the defendant acted both intentionally and either improperly or without justification; one who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a wrongful act per se or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another; a wrongful act per se is an act that is inherently wrongful or that can never be justified under any circumstances; the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference when the defendant's conduct was not wrongful per se; to establish that a lawful act was done with malice and without justification, the plaintiff must prove with particularity affirmative acts taken by the defendant that corroborate the improper motive of the interference; when motivated by legitimate business reasons, a defendant's actions do not constitute improper motive or interference.

5. TORTS — INTERFERENCE WITH A BUSINESS EXPECTANCY — AGENTS — THIRD PARTY TO CONTRACT OR BUSINESS RELATIONSHIP.

A plaintiff must establish that the defendant was a third party to the contract or business relationship in order to maintain a claim of tortious interference with a business expectancy; corporate agents are not liable for tortious interference with respect to the corporation's contracts and relationships when acting for the benefit of the corporation and within the scope of their authority; an agent can be liable, however, if the agent acted not for the benefit of the corporation or entity involved in the transaction or prospective transaction, but for his or her own benefit or pursuant to a personal motive.

*McAlpine & Associates, P.C.* (by *Mark L. McAlpine* and *Ryan W. Jezdimir*), for plaintiff.

*Sullivan, Ward, Asher & Patton, P.C.* (by *Kevin J. Gleeson* and *Maria L. Meldrum*), for defendant.

Before: MURPHY, C.J., and K. F. KELLY and STEPHENS, JJ.

MURPHY, C.J. Plaintiff appeals as of right the trial court's order granting summary disposition in favor of defendant. This case involves a claim of tortious interference with a business expectancy arising out of, allegedly, defendant's improper conduct, communications, and recommendations that resulted in a school district's decision not to award plaintiff a construction project despite plaintiff's submission of the lowest bid. We hold that genuine issues of material fact existed with respect to the elements of plaintiff's cause of action. More specifically, we reject the trial court's determination that, as a matter of law, plaintiff lacked a valid business expectancy. Plaintiff, as the lowest bidder, submitted evidence sufficient to create a factual dispute with respect to whether it was a "responsible" contractor to the extent that the trier of fact could have concluded that there existed a reasonable probability or likelihood that plaintiff would have been awarded the project absent the alleged tortious interference. Therefore, there was a genuine issue of material fact with respect to whether plaintiff had a valid business expectancy. We emphasize that the submission of the lowest bid, in and of itself, was inadequate to sustain plaintiff's suit. We reject any rule per se that would allow litigation to proceed simply on the basis of proof of the lowest bid, except, of course, if no additional criteria needed to be satisfied, which is unlikely. Absent sufficient additional evidence on relevant award criteria, there would be no valid business expectancy. We further reject the trial court's determination that, as a matter of law, plaintiff failed to show that defendant did anything improper. Plaintiff submitted evidence sufficient to create a factual dispute with respect to whether defendant's conduct was intentional and improper, motivated by malice and not legitimate business reasons. On this issue, we emphasize that the exercise of professional business judgment in making recommendations relative to governmental con-

tracts and projects must be afforded some level of protection and deference. But we will not preclude litigation when there exists evidence suggesting that the ostensible exercise of professional business judgment is in reality a disguised or veiled attempt to intentionally and improperly interfere with the contractual or expectant business relationships of others. Here, issues of fact were established and, accordingly, we reverse and remand.

## I. BACKGROUND

The Davison Community Schools (DCS) opened bidding on a construction project that entailed work at two school sites. Pursuant to a contract, defendant, an architectural firm, assisted the DCS with the bid-selection process by reviewing and evaluating bid applications, investigating competing contractors and their references, expressing opinions and views on contractor competence and workmanship, and making recommendations regarding which contractor should be awarded the project. Plaintiff's bid was the lowest submitted to the DCS by any contractor. After entertaining all the submitted bids, the DCS, as recommended by defendant, elected to award the contract on the construction project to the contractor that had submitted the second lowest bid, not plaintiff.

Plaintiff filed suit against defendant, alleging a single count of, as framed by plaintiff, tortious interference with prospective economic relations.[1] Plaintiff asserted that there existed an expectancy of a valid business relationship developing between it and the DCS, that defendant was aware of the expectancy, that defendant intentionally interfered with the expectant relationship

---

[1] For purposes of this opinion, we shall refer to plaintiff's claim as "tortious interference with a business expectancy."

by wrongfully claiming that plaintiff was unqualified to perform the work on the project, that defendant's wrongful interference terminated the expectancy, and that plaintiff suffered damages as a result of the interference, including lost profits. In our analysis, we shall explore in detail the nature of the documentary evidence and how it relates to the issues presented.

The trial court granted defendant's motion for summary disposition under MCR 2.116(C)(10), ruling that the evidence failed to show that plaintiff had a reasonable or valid expectation of entering into a business relationship with the DCS and that the evidence fell short of showing that defendant did anything improper.

## II. ANALYSIS

### A. STANDARD OF REVIEW AND GENERAL SUMMARY-DISPOSITION PRINCIPLES

This Court reviews de novo a trial court's decision on a motion for summary disposition. *Allen v Bloomfield Hills Sch Dist*, 281 Mich App 49, 52; 760 NW2d 811 (2008). MCR 2.116(C)(10) provides for summary disposition when there is no genuine issue regarding any material fact and the moving party is entitled to judgment or partial judgment as a matter of law. A motion brought under MCR 2.116(C)(10) tests the factual support for a party's cause of action. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact. *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996), citing MCR 2.116(G)(5). The trial court's task in reviewing the motion entails consideration of the record evidence and all reasonable infer-

ences arising from that evidence. *Skinner*, 445 Mich at 161. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). A court may only consider substantively admissible evidence actually proffered relative to a motion for summary disposition under MCR 2.116(C)(10). *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999). The trial court is not permitted to assess credibility, to weigh the evidence, or to determine facts, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). *Skinner*, 445 Mich at 161; *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 437; 695 NW2d 84 (2005).

### B. VALID BUSINESS EXPECTANCY

On appeal, plaintiff first argues that the trial court erred by granting the motion for summary disposition when there was evidence sufficient to create a factual issue regarding whether plaintiff, as a qualified and responsible bidder that submitted the lowest bid, had a valid business expectancy. We agree.

### 1. THE CASELAW

With respect to a claim of tortious interference with a business expectancy, a plaintiff must prove (1) the existence of a valid business expectancy, (2) knowledge of the expectancy on the part of the defendant, (3) an intentional interference by the defendant inducing or causing a termination of the expectancy, and (4) resultant damage to the plaintiff. *Dalley v Dykema Gossett PLLC*, 287 Mich App 296, 323; 788 NW2d 679 (2010);

*Blazer Foods, Inc v Restaurant Props, Inc*, 259 Mich App 241, 254; 673 NW2d 805 (2003). A valid business expectancy is one in which there exists a reasonable likelihood or probability that the expectancy will come to fruition; mere wishful thinking is not sufficient to support a claim. *First Pub Corp v Parfet*, 246 Mich App 182, 199; 631 NW2d 785 (2001), vacated in part on other grounds 468 Mich 101 (2003); *Trepel v Pontiac Osteopathic Hosp*, 135 Mich App 361, 377; 354 NW2d 341 (1984).

In *Joba Constr Co, Inc v Burns & Roe, Inc*, 121 Mich App 615; 329 NW2d 760 (1982), the plaintiff was a corporation that engaged in underground and heavy-duty construction, and the defendant was a firm of consulting engineers that had been retained by the Detroit Public Lighting Commission (PLC) under contract relative to a planned expansion of a utility station. Comparable to defendant's duties here, the engineering firm had contracted "to prepare construction specifications, evaluate bids made by contractors and make recommendations to the PLC as to which contractor should be awarded contracts." *Id.* at 624. The plaintiff submitted the lowest bid, but the engineering firm recommended that the PLC award the construction contract to another contractor "as it felt plaintiff was unqualified to perform the contract." *Id.* The PLC followed the defendant's recommendation, and the plaintiff was denied the contract. On another utility project, a general contractor had been awarded a construction contract by the PLC, and that contractor had designated the plaintiff as a subcontractor. The engineering firm, however, indicated that the plaintiff was an unacceptable subcontractor, and the plaintiff was then removed from the project. The plaintiff sued the defendant for tortious interference with prospective

advantageous economic relations, and the jury returned a verdict in favor of the plaintiff in the amount of $272,368. *Id.* at 624-625.

On appeal, the defendant claimed that the trial court had erred by denying its motion for a directed verdict, arguing "that it was entitled to a directed verdict as plaintiff failed to produce sufficient evidence to raise a question of fact as to a valid expectancy that the contracts would have been awarded to plaintiff absent defendant's alleged interference." *Id.* at 633. The defendant maintained that "the *discretionary* factors going into the determination of who is the lowest *qualified* bidder preclude[d] plaintiff from proving it had an expectation of being awarded the contracts." *Id.* at 634 (emphasis added). The *Joba Constr* panel stated that, to support the tortious-interference claim, the plaintiff had to prove that it was reasonably likely or probable that a specific and reasonable economic advantage or expectancy would indeed develop and occur. *Id.* at 634-635. The panel stated that the plaintiff was not required to demonstrate a guaranteed relationship, considering that anything defined as prospective in nature would necessarily be uncertain, and stated that while certainties need not be shown, there must be something more than innate optimism or mere hope. *Id.* at 635. This Court concluded that the plaintiff had submitted "sufficient evidence to create a question of fact as to whether it was the lowest qualified bidder and thus had a legitimate expectancy in obtaining the contracts . . . ." *Id.*[2]

---

[2] While the *Joba Constr* opinion did indicate that the plaintiff was the lowest bidder on the first project, it did not reveal the nature of the evidence presented at trial with respect to the plaintiff being a "qualified" bidder.

In *Trepel*, 135 Mich App at 377-381, this Court tackled the issue of whether the trial court had properly granted summary disposition on a counterclaim of tortious interference with a prospective advantage, focusing attention on the lower court's determination that no valid business expectancy existed. The counterclaim was pursued by one of the defendants, a hospital, against the plaintiff, a radiologist. The hospital had applied for approval of a bond issue from the Michigan State Hospital Finance Authority (the authority), and the authority had granted tentative approval of a proposed sale of municipal bonds. The final step before consummation of the sale was obtaining approval of the sale by the Municipal Finance Commission (MFC), but the scheduled approval was substantially delayed and, as a consequence, the hospital ran out of money and had to obtain alternative financing at a much higher interest rate. The plaintiff had allegedly made good on threats to the hospital to send letters to the MFC in which he claimed that certificates of need filed by the hospital were defective. The alleged intent behind the sending of the letters by the plaintiff was to interfere with the hospital's application for approval of the bond issue, which approval was ultimately never obtained. *Id.* at 366-369.

The *Trepel* panel, examining whether the hospital had a valid business expectancy in obtaining approval of the bond issue from the government, first noted that there was an absence of Michigan caselaw "relating to interference with *discretionary* governmental action." *Id.* at 378 (emphasis added). This Court proceeded to review three federal court decisions, two of which approved of interference suits brought by parties that had submitted the most favorable bids on governmental contracts, *Lewis v Bloede*, 202 F 7 (CA 4, 1912), and *Pedersen v United States*, 191 F Supp 95 (D Guam, 1961), and one in which the court rejected a suit arising

out of a city council's decision relative to a request to close and relocate an alley that was delayed because of the need to hear from interested parties, *Carr v Brown,* 395 A2d 79 (DC App, 1978). *Trepel,* 135 Mich App at 379-380. The *Trepel* panel then ruled as follows:

> In the instant case, the discretion to be exercised by the MFC appears to be somewhat greater than that attributed to the governmental bodies in *Lewis* and *Pedersen, supra,* but significantly less than that in *Carr.* We perceive that *Carr* is a gloss on the general rule. It applies to situations where too many factors are in play to be able to reasonably infer that, but for defendant's allegedly wrongful action, plaintiff likely would have obtained the desired advantage. In this case, the MFC's grant of approval must be preceded by the determinations required by statute. A trier of fact might be persuaded that defendant hospital could ascertain with reasonable certainty whether the items listed in the statute were satisfied so that MFC approval was a probability. If the question were whether defendant hospital's application for a loan was denied because of [the plaintiff's] interference, defendant hospital would have made out a cause of action because a trier of fact could assess the causal effect of the [plaintiff's] actions.
>
> However, where the MFC approval is only delayed, as alleged here, the problem becomes more difficult. The MFC is required to make findings of fact before granting approval. Obviously, that task takes a certain amount of time to accomplish. However, the procedure involved is not a notice and comment type hearing, as in *Carr,* designed to let interested parties express their opposition. Defendant hospital should have the opportunity to prove its allegation that approval was "scheduled" for September 11, 1979.
>
> In *Lewis,* [202 F at] 20-21, and *Carr,* [395 A2d at] 84, reference is made to the prior history of the governmental entity in granting approval. Defendant hospital has sought to introduce evidence by way of affidavit of the MFC's perfect record in approving bond issues already approved by the Michigan State Hospital Finance Authority. We

believe such evidence if otherwise admissible could per-
suade a trier of fact at a contested trial. [*Id.* at 380-381.]

From *Joba Constr*, *Trepel*, and *First Pub*, and cases
relied on therein, we derive the following principles to
apply in determining whether there exists a valid busi-
ness expectancy: (1) the presence of some level of
discretion exercisable by a governmental body or
decision-maker does not automatically preclude a rec-
ognition of a valid business expectancy, (2) if the discre-
tion is expansive and not restricted by limiting criteria
and factors to an extent that it makes it impossible to
reasonably infer that the claimed expectancy would
likely have come to fruition, there is no valid business
expectancy, (3) an expectancy must generally be specific
and reasonable, (4) it must be shown that there was a
reasonable likelihood or probability that the expectant
relationship would have developed as desired absent
tortious interference with the expectancy, (5) a party
need not prove that the expectancy equated to a cer-
tainty or guarantee, (6) innate optimism or mere hope
is insufficient, and (7) the prior history of the govern-
mental body or decision-maker and governing internal
and external rules, policies, and laws constitute factors
for a court to consider in determining whether a busi-
ness expectancy was valid and likely achievable. Of
course, when addressing a motion for summary dispo-
sition under MCR 2.116(C)(10), these principles must
be viewed in the context of determining whether a
genuine issue of material fact exists on contemplation
of the documentary evidence.

### 2. APPLICATION OF THE LAW TO THE FACTS

We begin by examining the documents governing the
DCS and the bid-selection process. DCS's fiscal man-
agement policy (FMP) indicates multiple times that the

DCS Board of Education (Board) has and reserves the right to reject any or all bids. In one section of the FMP, it provides that the reservation of the right to reject bids includes "the bid of any contractor who is not reasonably determined to be 'responsible' in conjunction with this policy." The FMP, however, also provides:

> The Board ... hereby establishes this policy to satisfy its statutory duty to competitively bid contracts for construction of a new school building, or an addition to or repair or renovation of an existing school building of the [DCS], except for repairs in emergency situations. Bids *shall* be awarded in compliance with applicable bidding obligations imposed by law to the *"lowest responsible bidder."* [Emphasis added.]

This language, including use of the word "shall," indicates that if a bidding contractor submits the lowest bid on a project and is deemed "responsible," the Board is mandated to award the project to that contractor. *In re Kostin Estate*, 278 Mich App 47, 57; 748 NW2d 583 (2008) (" 'Shall' is mandatory."). There appears to be some tension between this provision and the FMP's language that gives the Board the authority to reject any or all bids, giving rise to the question whether the Board has the discretion to reject a bid from the "lowest responsible bidder." The term "lowest responsible bidder" is defined in the FMP as being

> [t]he Responsible Contractor that has submitted a fully complete and responsive bid that provides the lowest net dollar cost for all labor and materials required for the complete performance of the work of the Construction Project let for bid. Such bid must satisfy the requirements of all applicable local, state, and federal laws, this Policy, any administrative rules associated with this Policy developed by the Superintendent at the Board's direction, and bid documents used to solicit bids, and any other guidelines and specifications required for the Construction Project.

Because a bidder with the net lowest dollar cost bid may
not be a Responsible Contractor, the lowest dollar cost
bidder may not always receive award of the bid.

This definition refers to the term "Responsible Con-
tractor," and the FMP also defines that term as being

[a] contractor determined by the Board to be sufficiently
qualified to satisfactorily perform the Construction
Project, in accordance with all applicable contractual and
legal requirements. The Board's determination shall be
based upon: (1) an overall review of the Responsibility
Criteria listed below and the contractor's responses, or
failure to respond, to same; (2) the contractor's compliance
with this Policy and all applicable local, state and federal
laws; (3) the input of the District's architect(s) [here
defendant] and/or construction manager(s), if any; (4)
review of the contractor's proposed subcontractors; and (5)
other relevant factors particular to the Construction
Project.

The FMP then provides a definition of "Responsibility
Criteria," which sets forth a nonexclusive list of criteria
that can be examined and weighed by the Board in
determining whether a contractor is responsible.

In his affidavit, the superintendent of the DCS, R.
Clay Perkins, averred that the DCS had the authority
and right under the FMP to reject any or all bids and
that the FMP specifically apprised contractors that the
lowest bidder might not always be awarded a project.

The trial court was also provided with a project
manual drafted by defendant that addressed the adver-
tisement of bids and the planned construction to be
undertaken at the two work sites, Hill Elementary
School and Siple Elementary School. The project
manual twice indicates that the DCS "reserves the right
to accept or reject any or all offers." But the manual also
provides that the DCS "reserves the right to reject any
or all bids *where* incomplete or irregular, lacking bid

bond, data required by bidding documents, or where proposals exceed funds available." (Emphasis added.) This provision suggests that there is somewhat of a limitation on the grounds pursuant to which a bid can be rejected.

Defendant's reliance on the language in the FMP and project manual that gives the DCS the right to reject any or all bids reflects a failure to appreciate the language in the FMP that requires the DCS to award a project to the lowest responsible bidder. Indeed, defendant fails to even acknowledge the provision concerning the "lowest responsible bidder" mandate, let alone argue that it is negated by or subject to the language in the FMP and project manual on which defendant relies. Defendant's position suggests that the DCS has complete and unfettered discretion to reject a bid, but this is inconsistent with the "lowest responsible bidder" provision that mandates an award and inconsistent with the language in the project manual that indicates that the DCS has the right to reject bids, but only for certain reasons.

We hold, as a matter of law, that the multiple provisions reserving the right to reject bids are subject to the provision requiring an award to be made to the lowest responsible bidder; otherwise, the "lowest responsible bidder" provision is rendered meaningless and nugatory. In *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003), our Supreme Court stated:

> Just as "[c]ourts must give effect to every word, phrase, and clause in a statute and avoid an interpretation that would render any part of the statute surplusage or nugatory," courts must also give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory. [Citation omitted.]

We find no reason not to apply this same construction principle when interpreting the FMP. Further, our interpretation does not render the "right to reject" provisions surplusage or nugatory, given that they remain entirely enforceable in all circumstances other than a particular situation in which the bid being addressed was submitted by the lowest responsible bidder. Aside from the "lowest responsible bidder" provision itself, our conclusion finds some additional support in the FMP, in which, as already indicated, one of the provisions reserving the right to reject a bid also provides that the reservation encompasses "the bid of any contractor who is not reasonably determined to be 'responsible' in conjunction with this policy." This language tends to honor and can be read consistently with the "lowest responsible bidder" mandate. Further support can be found in the FMP's definition of "lowest responsible bidder," which provides, "Because a bidder with the net lowest dollar cost bid may not be a Responsible Contractor, the lowest dollar cost bidder may not always receive award of the bid." By corollary, this language suggests that if a contractor submits the lowest bid, it would be awarded the project at issue if the contractor is also properly characterized as being "responsible." Ultimately, our ruling rests on the fact that any other interpretation would render surplusage and nugatory the FMP's language that "[b]ids *shall* be awarded in compliance with applicable bidding obligations imposed by law to the *'lowest responsible bidder.'* " (Emphasis added.)

We next need to address whether plaintiff submitted evidence sufficient to create a genuine issue of material fact on the question whether it had a valid business expectancy, accepting the undisputed fact that plaintiff submitted the lowest bid and taking into consideration our construction of the FMP. Our attention must focus

on the requirement that the contractor or bidder be "responsible." The Board certainly has some discretion in making this determination. However, we are not prepared to rule that, as a matter of law, a contractor that submitted the lowest bid on a project, thereby satisfying one of the FMP award prerequisites of the "lowest responsible bidder" clause, can never establish a valid business expectancy merely because the Board had some discretion in determining whether that contractor was responsible.

The Board's discretion in awarding a project is not expansive or unrestricted by limiting criteria and factors to an extent that it makes it impossible to reasonably infer that plaintiff's claimed expectancy would likely have come to fruition. Rather, the FMP limits the discretion to an assessment of whether a contractor is "responsible," and that determination is subject to the factors and criteria delineated in the definitional section of the FMP. In determining whether a contractor is responsible, the ultimate question to be answered by the Board, according to the FMP, is whether the contractor is "sufficiently qualified to satisfactorily perform the Construction Project, in accordance with all applicable contractual and legal requirements." Certainly, a contractor submitting the lowest bid on a project, such as plaintiff, may be able to prove with testimony and other evidence that it was sufficiently qualified to complete the project in a satisfactory and legally and contractually compliant manner, to the extent that a trier of fact could conclude that there existed a reasonable likelihood or probability that the contractor would have been awarded the project absent tortious interference by a defendant. Supporting evidence that goes beyond innate optimism or mere hope could easily exist if a contractor truly has a stellar track

record in the construction field; certainty or a guarantee of an award need not be shown.

We shall now examine the documentary evidence presented in the trial court. Defendant's representative, Jackie Hoist, contacted and interviewed persons identified on plaintiff's bidder-qualification form in order to obtain opinions on the quality and timeliness of plaintiff's work on past projects. Hoist's typewritten notes of the responses and opinions supposedly communicated to her reflect some negative reviews of plaintiff's work, the harshest of which came from Hoist herself, who had worked with plaintiff on multiple projects.[3] The notes, however, also reflect some positive reviews, e.g., Richard Cedroni[4] "managed it well," "hands on job," "supervision was good," "would work with them again," "asked [plaintiff] to bid a lot of their jobs," "did a good job," "very dependable," "do what they [s]ay they will," "[s]chedule was fine," "[w]ork was very good as a whole," "[v]ery reasonable on change orders," "[w]ork quality was good," "redid work when necessary," and "[p]aperwork end was good." These responses and opinions came from many individuals and concerned several projects.[5] Additionally, the lower court record contains an affidavit by Cedroni and a letter from Cedroni to the DCS, which was also distributed at a public meeting to DCS committee members who were engaged in making a recommendation to the Board to award the project to US Construction and

---

[3] Hoist noted that, on one project, some of plaintiff's work was the worst that she had ever seen.

[4] Cedroni is plaintiff's president and principal representative.

[5] The documentary evidence is not clear regarding whether Hoist's notes themselves were shared with the DCS; however, defendant's brief in the trial court indicated that the notes were indeed shared and that the DCS chose another contractor on the basis of the notes and the information contained therein.

Design Services, LLC. Cedroni's affidavit and his circulated letter averred and expressed that plaintiff had performed quality work, had timely completed awarded projects, and had received excellent reviews, all with respect to numerous construction projects. The affidavit and letter were detailed and discussed specifics regarding the various projects, and they addressed and challenged the proclaimed negative opinions garnered by Hoist in her investigation conducted on behalf of defendant.[6]

In light of the documentary evidence indicating that plaintiff was sufficiently qualified to complete the project in a satisfactory manner, we conclude that a genuine issue of material fact existed concerning whether plaintiff was a responsible contractor to the extent that a trier of fact could conclude that there existed a reasonable likelihood or probability that plaintiff would have been awarded the project absent the alleged tortious interference by defendant. Stated otherwise, there was a genuine issue of material fact regarding whether plaintiff had a valid business expectancy.

As indicated in our introduction, we emphasize that the submission of the lowest bid, in and of itself, was inadequate to sustain plaintiff's suit. We reject any per se rule that would allow litigation to proceed simply on the basis of proof of the lowest bid, except, of course, when no additional criteria needed to be satisfied,

---

[6] Hoist's notes and Cedroni's affidavit and letter do raise concerns about hearsay. However, neither party argued in the trial court, nor argues on appeal, that any of the documentary evidence should be disregarded and not considered on the basis of hearsay. Indeed, both parties place some reliance on all three of the documents. Given that the parties have effectively agreed to allow consideration of the documents and their contents, we shall not engage in any hearsay analysis.

which is unlikely. Absent sufficient additional evidence on relevant award criteria, there would be no valid business expectancy.

We find it necessary to address some of the criticisms leveled by the dissent regarding the issue whether there could be a valid business expectancy. Initially, the dissent asserts that no cause of action exists to protect bidders on a governmental contract, citing *Talbot Paving Co v Detroit*, 109 Mich 657, 661-662; 67 NW 979 (1896). First, *Talbot Paving* addressed an action by a contractor against *a municipality*, and here plaintiff is not suing the DCS, but is proceeding on a tortious-interference claim against defendant. Next, *Talbot Paving* allowed for the possibility of a suit against a municipality if fraud were involved. *Id.* at 662. As can be gleaned from our discussion later in this opinion, there was evidence presented suggesting fraudulent conduct on the part of defendant. The dissent also cites *Leavy v City of Jackson*, 247 Mich 447, 450-451; 226 NW 214 (1929), another suit against the municipality itself, and *Leavy* recognized that a suit by a bidder could be maintained if the municipality did not act in good faith in the exercise of honest discretion or if fraud, injustice, or a violation of trust permeated the bidding process. Once again, as reflected later in our opinion, there is evidence indicating bad faith, a lack of honesty, injustice, and fraud.

The dissent contends that there could be no valid business expectancy because MCL 380.1267 gave the DCS unfettered discretion to reject a bid, since the statute provides no limiting criteria and because the FMP does not have the force of law. MCL 380.1267(6) provides, in part, that "[t]he board, intermediate school board, or board of directors may reject any or all bids, and if all bids are rejected, shall readvertise in the manner required by

this section." We first note that MCL 380.1267(6) does not restrict a board from imposing its own criteria and limitations on itself relative to the bidding process and the acceptance and rejection of bids. While the statutory language, standing alone, places no limits on discretion, the dissent's position ignores the reality that the FMP governed the bidding process. Superintendent Perkins averred that the FMP guided the bidding process and that the process involved identifying the lowest responsible bidder. The FMP itself provides that projects "requiring competitive bids shall be made in accordance with current statutes, the creation of bid specifications, *and* adherence to the District's bidding procedure[.]" (Emphasis added.) The FMP further provides that the requirements of the FMP "shall be incorporated into all bid documents used to solicit bids for construction projects[.]" We therefore conclude that the FMP is absolutely relevant to analyzing the issue whether plaintiff had a valid business expectancy.

Finally, we reject the dissent's reliance on unpublished opinions. MCR 7.215(J).

### C. TORTIOUS INTERFERENCE—INTENTIONAL AND IMPROPER CONDUCT

Plaintiff next argues that the trial court erred by granting the motion for summary disposition when a genuine issue of material fact existed with respect to whether defendant's communications to the DCS that plaintiff was not qualified constituted intentional and improper conduct.

#### 1. THE CASELAW

In regard to a claim of tortious interference with a business expectancy, a plaintiff must demonstrate that the defendant acted both intentionally and either improperly or without justification. *Dalley*, 287 Mich App

at 323. "[O]ne who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Badiee v Brighton Area Sch*, 265 Mich App 343, 367; 695 NW2d 521 (2005), quoting *CMI Int'l, Inc v Intermet Int'l Corp*, 251 Mich App 125, 131; 649 NW2d 808 (2002), quoting *Feldman v Green*, 138 Mich App 360, 378; 360 NW2d 881 (1984) (quotation marks omitted). A wrongful act per se is an act that is inherently wrongful or an act that can never be justified under any circumstances. *Badiee*, 265 Mich App at 367; *Prysak v R L Polk Co*, 193 Mich App 1, 12-13; 483 NW2d 629 (1992). When a defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference. *Badiee*, 265 Mich App at 367. To establish that a lawful act was done with malice and without justification, a plaintiff must prove, with particularity, affirmative acts taken by the defendant that corroborate the improper motive of the interference. *Mino v Clio Sch Dist*, 255 Mich App 60, 78; 661 NW2d 586 (2003); see also *Dalley*, 287 Mich App at 324. "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Id.* (quotation marks and citation omitted).

A false accusation may provide a basis to pursue a claim of tortious interference. *First Pub*, 246 Mich App at 199. In *Trepel*, 135 Mich App at 377, this Court noted that the defendant's counterclaim of tortious interference "clearly allege[d] unethical conduct—sending letters knowing them to contain false allegations."

2. APPLICATION OF THE LAW TO THE FACTS

The FMP provides that the determination whether a contractor is a responsible contractor shall be based, in part, on "the input of the [DCS's] architect," which in this case was defendant. The contract between the DCS and defendant provides that defendant "shall assist the [DCS] in obtaining competitive bids and shall assist the [DCS] in awarding and preparing contracts for construction." Superintendent Perkins averred that plaintiff had submitted the lowest bid, but, "[b]ased on the review by the Board Committee and the recommendations of [defendant], [the DCS] decided to award the Project to US Construction[.]" There is no dispute that, consistently with its obligation to provide assistance in the bid-selection process, defendant made a recommendation and conveyed information to the DCS regarding plaintiff and its bid. Hoist sent a letter on behalf of defendant to the DCS in which she stated:

> We have reviewed the apparent low bidder[']s proposal, references, past experience and qualifications. At the close of the review, we recommend that you move to the second low bidder, US Construction . . . . They have provided construction services for other projects designed by [us] & for [the DCS], and have performed the work adequately.

It can reasonably be inferred from this letter that Hoist, and thus defendant, found that plaintiff had a poor work history and consequently would not adequately perform the work on the project at issue. And Perkins's averment indicating that the award decision was based, in part, on defendant's recommendation provides evidence of a causal relationship between defendant's conduct and the decision to award the project to US Construction instead of plaintiff. Further support of a causal relationship is an e-mail to Perkins from the DCS's director of finance and operations,

Daniel Romzek, in which he stated that Hoist "still stands by her recommendation not to proceed with the low bidder, and I told her that we will rely on her reference checks and recommendation for our recommendation to the board." For these reasons, we respectfully disagree with the dissent's position that plaintiff failed to establish causation.

There was conflicting evidence presented regarding plaintiff's workmanship on various projects. In Hoist's notes, she indicated that the contact person on a construction project involving toilet buildings at the Island Lake State Park stated that plaintiff had failed to meet the project's schedule, failed to follow the plans and specifications, failed to provide supervision, and failed to follow up on matters. The contact person also stated that plaintiff's work was of poor quality and that he believed that "the state put [Cedroni] on their 'may not bid' list." Cedroni asserted in his affidavit that the contact person on the Island Lake project was employed by defendant, which acted as the architect on the project. Cedroni further averred that plaintiff "timely and properly completed all work on the project considering the design errors of [defendant]." Cedroni additionally attested that "[t]he work was fully completed and was of good quality, as proven by [plaintiff's] receipt of full payment for the project[, and plaintiff] had on-site supervision during the entire course of the project."

In Hoist's notes, she indicated that she spoke with a person from Architectural Systems Group regarding a prime subcontract and that the individual stated that plaintiff was "[n]ot good to deal with." In Cedroni's affidavit, he averred that plaintiff "is currently working with Architectural Systems Group as part of a $170,000 contract[.]"

In Hoist's notes, she indicated that Ken Kander, a contact person on a construction project involving the Holly Academy, stated that he would not say anything negative about plaintiff, nor would he say anything positive. Another contact person on the Holly Academy project supposedly told Hoist that he would never hire plaintiff for the DCS construction project. In Cedroni's affidavit, he attested as follows regarding the Holly Academy project, for which defendant provided architectural services:

> Ken Kander will attest that Cedroni completed quality work on the project, had appropriate levels of supervision, and addressed any concerns of the owner. The problems on this construction project were due to [defendant]. [Plaintiff] suggested an alternative ballast to the one [defendant] had specified. [Defendant] rejected [plaintiff's] proposal. [Defendant's] specified ballasts were problematic and [plaintiff's] subcontractor has made repeated visits to the construction project to address the problems. In fact, Holly Academy has since retained a new architect rather than work any further with [defendant].[7]

In his letter presented to the DCS committee involved in the bidding process, Cedroni stated that he had spoken to the owner of the Holly Academy numerous times "and he was very happy with our quality and performance on the project and would not hesitate to utilize our services again."

---

[7] Returning to our hearsay concern, aside from again noting that neither party raises hearsay issues, we would note that Cedroni's claims with respect to what others told him about plaintiff's workmanship would not be hearsay in the context of this issue because their statements would not be offered to prove the truth of the matter asserted. MRE 801(c). For purposes of this issue, statements that, for example, plaintiff did quality work on a project would not be used to prove that plaintiff indeed did quality work, but simply to show that the declarant made a statement contrary to one attributed to him or her in Hoist's notes, calling into question Hoist's truthfulness and showing improper conduct. See *Merrow v Bofferding*, 458 Mich 617, 631; 581 NW2d 696 (1998).

Hoist's notes also reflect her own thoughts regarding plaintiff's workmanship on projects that plaintiff and defendant worked on together. According to Hoist, plaintiff's work at Holly Academy lacked supervision and showed poor workmanship. She also indicated that the quality of plaintiff's work on the project was reflective of their bid "and about what I expected from Cedroni, but in addition to the low quality, his follow-up on construction issues, especially with regard to their lighting problem, is unacceptable to me." In an e-mail from Hoist to Kander regarding the Holly Academy project, Hoist complained of plaintiff's failure to deal with a problem with lights, and she then stated, "So, here's where the rubber may hit the road for Cedroni, [h]e was low bidder on some work we are doing for [the DCS]." Regarding a construction project involving a maintenance building in Rochester Hills, Hoist described some of plaintiff's work as the worst that she had ever seen. With respect to that project, Cedroni averred that the problems were caused by defendant.

In his letter presented to the DCS committee, Cedroni made the following observations regarding his company:

> I have personally contacted all parties on this document [Hoist's notes] and all admitted to talking to Jackie. They all reported giving good reviews and glowing reports of our performance, except for one architect. After speaking with this architect and explaining to him that his comment could be viewed as damaging, he stated he didn't think his review was particularly bad and he would have no problem working with us in the future.

> \* \* \*

> ... I have found no definitive reason as to why my company should not be recommended for this project. I am offering to complete this job at nearly $50,000 less than the

next lowest bidder . . . . We have never been removed from a project and never received a poor review from any architect/owner we've worked with. Even after our last project with [defendant], I was told they had no issue with our performance and we could use them as a reference for future work.

Viewing the conflicting and inconsistent evidence and the inferences arising from it in a light most favorable to plaintiff, a trier of fact could reasonably conclude that defendant acted with malice, in a wrongful manner per se, unethically, with an improper motive and absence of justification, or deceitfully with respect to the damaging information and recommendation conveyed to the DCS. If plaintiff's evidence were found to be credible by the trier of fact, it could reasonably conclude that defendant acted intentionally and improperly in an effort to interfere with plaintiff's business expectancy, i.e., being awarded the construction project by the DCS. It is quite evident in reviewing the documentary evidence that a great deal of friction and animosity had developed between plaintiff and defendant over past projects by the time the bid-selection process took place here, and a trier of fact could determine that defendant's recommendation was motivated by malice and not legitimate business reasons. Summary disposition was simply inappropriate in light of the record.

As indicated in our introduction, we emphasize that the exercise of professional business judgment in making recommendations relative to governmental contracts and projects must be afforded some level of protection and deference. But we will not preclude litigation when there exists evidence suggesting that the ostensible exercise of professional business judgment is in reality a disguised or veiled attempt to intentionally and improperly interfere with the contrac-

tual or expectant business relationships of others.
There is evidence here indicating that defendant,
through Hoist, was being untruthful and inaccurate in
its portrayal of plaintiff. The trier of fact must sort
through all the conflicting evidence and assess the
credibility of the parties' claims and their witnesses.

Finally, the dissent posits that there was no evidence
that Hoist provided false information to the DCS or had
an improper motive and that the information supplied
by Hoist simply constituted a negative opinion. The
dissent asserts that the evidence merely reflected pro-
fessional disagreements. We respectfully conclude that
the dissent fails to view the evidence in a light most
favorable to plaintiff and fails to consider reasonable
inferences arising from the evidence. A reasonable
inference arising from Cedroni's affidavit is that Hoist
was lying, and Cedroni's letter indicates that glowing
reviews were given to Hoist, which, if true, would
directly establish that she was lying. Taking into con-
sideration Cedroni's affidavit and letter, along with the
other documentary evidence, and viewing it in a light
most favorable to plaintiff, this case entails more than
professional disagreements and negative opinions.

### D. DEFENDANT'S RELATIONSHIP WITH THE DCS

The dissent argues that defendant is entitled to
summary disposition on the basis that defendant was
not a third party to the prospective contract or relation-
ship between plaintiff and the DCS; rather, defendant
was an agent of the DCS and thus a tortious-
interference cause of action cannot be maintained. We
initially note that defendant itself does not make this
argument, nor did the trial court address this issue.

A plaintiff must establish that the defendant was a
third party to the contract or business relationship in

order to maintain a tortious-interference claim, and therefore corporate agents are not liable for tortious interference with respect to corporation contracts and relationships when acting for the benefit of the corporation and within the scope of their authority. *Lawsuit Fin, LLC v Curry*, 261 Mich App 579, 593; 683 NW2d 233 (2004); *Reed v Mich Metro Girl Scout Council*, 201 Mich App 10, 13; 506 NW2d 231 (1993). For purposes of examining and applying this particular principle of law, we first question whether it is proper to classify defendant as a "corporate agent" rather than a "third party" relative to the relationship between plaintiff and the DCS. The caselaw addressing the principle has almost always been in the context of a situation in which the defendant was an actual employee or officer of the corporation or entity involved in the relationship or prospective relationship. *Reed*, 201 Mich App at 13 (executive director and chief officer of the defendant Girl Scout council); *Bradley v Philip Morris, Inc*, 194 Mich App 44, 46; 486 NW2d 48 (1992), vacated in part on other grounds 440 Mich 870 (1992) (employees of tobacco company); *Feaheny v Caldwell*, 175 Mich App 291, 294-295; 437 NW2d 358 (1989) (top executives of Ford Motor Company); *Dzierwa v Mich Oil Co*, 152 Mich App 281, 283; 393 NW2d 610 (1986) (president and director of oil company); *Stack v Marcum*, 147 Mich App 756, 758; 382 NW2d 743 (1985) (employee supervisor at phone company); *Tash v Houston*, 74 Mich App 566, 568; 254 NW2d 579 (1977) (president of union). There is no indication that Hoist or any of defendant's personnel were employees or officers of the DCS. While *Lawsuit Fin* did not involve a defendant who was an employee or officer, the alleged interference occurred within the sanctity of the attorney-client relationship. *Lawsuit Fin*, 261 Mich App at 583.

Nevertheless, assuming for the sake of argument that defendant was an agent of the DCS and not a third party relative to the relationship between plaintiff and the DCS, that would not automatically insulate defendant from liability. Instead, even an agent can be held liable for tortious interference if the agent acts not for the benefit of the corporation or entity involved in the transaction or prospective transaction, but for his or her own benefit or pursuant to a personal motive. *Reed*, 201 Mich App at 13; *Bradley*, 194 Mich App at 50-51 (examining whether actions were based on personal motivation or for personal benefit); *Feaheny*, 175 Mich App at 294-295 (examining whether the defendants acted out of a personal motive to harm the plaintiff or to acquire a pecuniary advantage); *Stack*, 147 Mich App at 759-760 (examining whether the conduct at issue was to further the defendant's own ends); *Tash*, 74 Mich App at 571-574 (stating that the defendant agent must not act for a strictly personal motive and must proceed with an honest belief that actions will benefit the company).

Reviewing the evidence in a light most favorable to plaintiff, and taking into consideration reasonable inferences arising from the evidence, a genuine issue of material fact existed regarding whether Hoist was honestly acting for the benefit of the DCS or whether she was acting solely for her own benefit and out of motivation to harm plaintiff. As already indicated, a trier of fact, on the basis of the evidence, could reasonably conclude that defendant acted with malice, in a wrongful manner per se, unethically, with an improper motive and absence of justification, or deceitfully in regard to the damaging information and recommendation conveyed to the DCS. There was evidence of an acrimonious relationship between Hoist and Cedroni, and it could reasonably be inferred from the e-mail Hoist sent to Kander, when considered in conjunction with the

other evidence, that Hoist was out to sabotage plaintiff's efforts in the bid process. If the information conveyed to the DCS was fabricated, and given the history between Hoist and Cedroni, one could conclude that Hoist was driven by a personal motive to get back at Cedroni and not by a good-faith attempt to benefit the DCS. The winning contractor was to work with defendant in completing the project, and Hoist's recommendation benefited her in that she would not be forced to work on the project with Cedroni, of whom she had a very negative opinion. Again, issues of fact abound and summary disposition was improper. We further note that very little discovery had taken place before the summary disposition motion was granted, and further discovery could greatly sharpen the issues presented. Finally, this Court's decision in *Joba Constr* would effectively have to be ignored on the issue now raised by the dissent, given that the defendant engineering firm in that case was also arguably an agent for the city.

### III. CONCLUSION

In light of the documentary evidence indicating that plaintiff was sufficiently qualified to complete the project in a satisfactory manner, we conclude that a genuine issue of material fact existed concerning whether plaintiff was a responsible contractor to the extent that the trier of fact could conclude that there existed a reasonable likelihood or probability that plaintiff would have been awarded the project absent the alleged tortious interference by defendant. Thus, there was a genuine issue of material fact regarding whether plaintiff had a valid business expectancy.

Furthermore, viewing the conflicting and inconsistent evidence and the inferences arising from it in a light most favorable to plaintiff, a trier of fact could

reasonably conclude that defendant acted intentionally and improperly in an effort to interfere with plaintiff's business expectancy.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction. Having fully prevailed on appeal, plaintiff is awarded taxable costs pursuant to MCR 7.219.

STEPHENS, J., concurred.

K. F. KELLY, J. (*dissenting*). I respectfully dissent. The trial court correctly determined that plaintiff lacked a valid business expectancy in a potential governmental contract. In my view, plaintiff merely had a legitimate expectancy that the bidding process would be openly and fairly conducted and, thus, it had to establish fraud, injustice, or violation of trust in order to avoid summary disposition. Moreover, even assuming that the majority's framework of analysis is correct, plaintiff nonetheless failed to show that defendant did anything improper or that its conduct was anything other than the exercise of professional business judgment. Accordingly, I would affirm the trial court's order granting summary disposition in favor of defendant.

### I. STATEMENT OF FACTS

This action arises out of the bidder selection process for a construction project undertaken by the Davison School District that involved renovations and new construction at the Hill and Siple elementary schools (the project). In June 2003, the school district contracted with defendant to provide professional architectural and engineering services for the project. In addition to providing these services, defendant agreed to assist the school district in the administration and implementa-

tion of the project, to provide evaluations and recommendations during all phases of the project, and to help the school district obtain competitive bids. With regard to the competitive-bidding process, it was defendant's role to assist the school district with "bid validation or proposal evaluation and determination of the successful bid or proposal, if any." In this capacity, defendant was responsible for advertising the project and distributing bidding documents to prospective bidders and, if requested by the school district, for assisting in interviewing, selecting, and negotiating with prospective contractors. Defendant designated Jackie Hoist to act as its designated representative to assist the district with the project.

With respect to the competitive-bidding process, the school district's fiscal management policy (FMP) provides that bids shall be awarded consistently with applicable law. The applicable provision of law, MCL 380.1267, provides, in relevant part:

> (1) Before commencing construction of a new school building, or addition to or repair or renovation of an existing school building, except repair in emergency situations, the board of a school district . . . shall obtain competitive bids on all the material and labor required for the complete construction of a proposed new building or addition to or repair or renovation of an existing school building.

> (2) The board . . . shall advertise for the bids required under subsection (1) by placing an advertisement for bids at least once in a newspaper of general circulation in the area where the building or addition is to be constructed or where the repair or renovation of an existing building is to take place and by posting an advertisement for bids for at least 2 weeks on the department of management and budget website on a page on the website maintained for this purpose or on a website maintained by a school

organization and designated by the department of management and budget for this purpose. . . .

*   *   *

(6) At a public meeting identified in the advertisement for bids described in subsection (3), the board . . . or its designee shall open and read aloud each bid that the board . . . received at or before the time and date for bid submission specified in the advertisement for bids. *The board . . . may reject any or all bids*, and if all bids are rejected, shall readvertise in the manner required by this section. [Emphasis added.]

The FMP further provides that "[b]ids shall be awarded . . . to the 'lowest responsible bidder.' " The FMP indicates that the lowest responsible bidder, i.e., the responsible contractor that submits the lowest bid, is not necessarily the lowest overall bidder because that bidder might not be a responsible contractor. In determining who is a responsible contractor, the FMP directs the district's school board to rely on a variety of factors, including responsibility criteria and the recommendation of the architect. Responsibility criteria take into account a wide variety of information relating to a particular contractor, such as projects completed during the last three years, experience with projects similar to those being bid on, and references from third persons who have hired the contractor, and, importantly, the FMP defines a responsible contractor as a contractor "determined by the Board to be sufficiently qualified to satisfactorily perform the [c]onstruction project . . . ." Further, under the FMP, the board specifically reserves "the right to reject any or all bids, including the bid of any contractor who is not reasonably determined to be 'responsible' in conjunction with this policy."

In July 2007, defendant prepared a project manual for the project. The manual established a method by which the school district would procure bids on the project consistent with applicable law, see MCL 380.1267. It provided a bid advertisement, which required bidders to submit a bidder-qualification form with their proposals and indicated that "offer[s] will be required to be submitted under a condition of irrevocability for a period of thirty (30) days after submission"[1] and that the "[o]wner reserves the right to accept or reject any or all offers." Bid instructions provided to applicants contained similar provisions.

In October 2007, plaintiff submitted a bid on the project. In its application, plaintiff identified five public-sector educational clients that it had completed projects for and a contact person for each of them, including (1) Irene Hughes Building, contact John Tagle, (2) Holly Academy, contact Les Hartzman, (3) Detroit Public Schools, contact Tim Rothermel, (4) Denby High School, contact Rob Marintette, and (5) Southwestern High School, contact Tom Miller. Plaintiff also identified three current or prior similar projects to those at issue here: (1) Holly Academy, contact Les Hartzman, (2) Madison Heights Library, contact Elizabeth Muzyk,[2] and (3) Warren Consolidated Schools, contact David Gassen. Plaintiff included the necessary contact information for each of these previous clients. Notably, Hoist had personal knowledge of plaintiff's work product because defendant had worked with plaintiff on the Holly Academy project.

---

[1] Apparently, the purpose of the 30-day irrevocability period was to give the district time to determine whether bidders were responsible contractors.

[2] Elizabeth's surname was spelled "Muzyk" in plaintiff's documents and "Musyk" in defendant's documents.

On October 17, 2007, the school board opened all the contractors' bids. Of the six bids submitted, plaintiff's bid was the lowest. Defendant then checked plaintiff's references, and Hoist conducted interviews. Hoist spoke to several of plaintiff's identified contacts, including Tagle, Hartzman, Rothermel, Muzyk, and Gassen. She also spoke with Ken Kander, another person affiliated with the Holly Academy project; Jim Tomblinson and Bryan Hall, who had apparently worked with plaintiff on other projects; and two persons identified as Ron K and Aaron W. According to plaintiff, Kander and Hall were outside sources, while Tomblinson, Ron, and Aaron were affiliated with defendant. These people had differing opinions regarding plaintiff's work, both positive and negative. Apparently, Hoist made notes of these conversations, which provided:

**Contact #1** — David Gassen — Partners in Architecture

2005 or 2006 thinks $600,000 Warren Consolidated Schools Service Center Connecting Links.

Work was a tight schedule, people were in the building, He managed it well, hands on job, supervision was good, would work with them again. His firm has asked them to bid a lot of their jobs.

**Contact #2** — Jim Tomblinson

2003 or 2004

State Island Lake State Park Toilet Buildings

Cedroni didn't meet the project schedule

Did not follow plans and specs

Lack of supervision

No follow-up

Poor quality

He thinks the state put him on their "may not bid" list

**Contact #3** — Bryan Hall regarding a prime sub-contract — casework

Architectural Systems Group

Says Not good to deal with

**Contact #4** — Tim Rothermel — ABC Paving

Detroit Public Schools Jayne Field Fieldhouse. $80,000 exterior and interior work, concrete, finishes, and cmu.

Worked for them but not recently, did a good job, very dependable, do what they way [sic] they will. Schedule was fine, they ended up getting into winter conditions but it was not Cedroni's fault.

**Contact #5** — Elizabeth Musyk — Eares and Associates

$700,000 — City of Madison Heights Library, January 2007, grand opening was in July. Work was very good as a whole. Problems with the electrical sub who did not finish on time. Schedule lag. DTE got them behind as too. Did as much as possible to keep (on schedule). Very reasonable on change orders.

**Contact #6** — John Tagle

Irene Hughes Building Alterations, Flint — State of Michigan job $100,000

Work quality was good, redid work when necessary. Did not follow documents closely. Fairly good. Paperwork end was good. Schedule — didn't meet deadlines but not all his fault. The fire marshal and the state agencies were involved. There were some things/issues created that didn't have to be created. He did things his own way, then they had to scramble and re-design

**Contact #7** — Les Hartzman

Holly Academy, 2006 $260,000

Laughed, said he didn't have a problem with the guy. Would not hire him for this job.

**Contact #8** — Ken Kander

2006 Holly Academy $260,000.

Declined to comment

I won't say anything negative but I won't say anything positive either.

**Myself**

Worked with him on several projects. Rochester [H]ills Maintenance addition, Rochester Hills Paths and Vault Toilets, and Holly Academy.

Some of the work at the Maintenance addition was the worst I'd seen — I told him that. Holly as [sic] lacking supervision and workmanship was poor. The quality level received is reflective of their bid and about what I expected from Cedroni, but in addition to the low quality, his follow-up on construction issues, especially with regard to their lighting problem, is unacceptable to me.

**Ron K.** reminded me that the Paths and vaults project was so late that the owner almost lost their grant money and had to finish up the work themselves just to close out the contract.

**Aaron W.** reminded me that when we did pre-award interview at Holly — I warned him that past shortcomings will not be tolerated.

Ultimately, Hoist did not recommend plaintiff to the school district, and plaintiff was made aware that it had not been recommended. In response, Richard Cedroni, plaintiff's president, wrote a letter to "All Interested Parties" regarding the matter. In the letter, he stated:

Jackie Hoist was forthcoming enough to let me know she intended to not recommend our company as general contractors for this project. I admire her frankness, but I obviously do not agree with her evaluation. . . . I have personally contacted all [our references] and all admitted to talking with Jackie. They all reported giving good reviews and glowing reports of our performance, except for one architect. After speaking with this architect and explaining to him that his comment could be viewed as damaging, he stated he didn't think his review was particularly bad and he would have no problem working with us in the future.

> Quite truthfully, I was shocked to hear her intentions, as
> we have recently worked together to complete a classroom
> renovation at Holly Academy. The project was successfully
> completed on time, with the only difficulty coming from the
> state office of fire and safety. . . . I have spoken with [the]
> owner numerous times and he was very happy with our
> quality and performance on the project and would not
> hesitate to utilize our services again.
>
> Based upon my research, I have found no definitive
> reason as to why my company should not be recommended
> for this project. I am offering to complete this job at nearly
> $50,000 less than the next lowest bidder . . . . We have
> never been removed from a project and never received a
> poor review from any architect/owner we've worked with.
> Even after our last project with [defendant], I was told they
> had no issue with our performance and we could use them
> as a reference for future work.

On October 30, 2007, a district committee held a
meeting regarding the bids. Cedroni appeared at the
meeting, distributed copies of his letter, and addressed
the committee. Plaintiff did not allege that the state-
ments of the respective references were *not* made, or
that Hoist had transcribed them inaccurately; rather,
plaintiff merely disagreed with the content of the opin-
ions expressed. Ultimately, the committee approved
defendant's recommendation to award the contract to
the second lowest bidder, "contingent upon review of"
Cedroni's letter, and forwarded its recommendation to
the school board. After further review, and based on the
recommendations of the committee and defendant, the
board awarded the contract to the second lowest bidder,
US Construction and Design Services, LLC. At the time,
US Construction had an active contract with the school
district and was performing in a satisfactory manner.

On May 20, 2008, plaintiff filed suit against defen-
dant for tortious interference with business relations.
Defendant moved for summary disposition pursuant to

MCR 2.116(C)(8) and (10). After arguments, the court determined that plaintiff did not have a valid business expectancy because all the documentation indicated that the lowest overall bidder was not guaranteed to receive the contract and the board never implied that it would accept plaintiff's bid. The court also determined that there was no evidence indicating that defendant's conduct was improper. It therefore granted defendant's motion pursuant to MCR 2.116 (C)(10).

### II. STANDARD OF REVIEW

We review de novo a trial court's ruling on a motion for summary disposition. *Gillie v Genesee Co Treasurer*, 277 Mich App 333, 344; 745 NW2d 137 (2007). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). When reviewing a motion under MCR 2.116 (C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant record evidence in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists warranting a trial. *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West*, 469 Mich at 183. A motion under MCR 2.116(C)(8) tests the legal sufficiency of a complaint. *Badiee v Brighton Area Sch*, 265 Mich App 343, 351; 695 NW2d 521 (2005). "The motion may be granted only where the claims are so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." *Cummins v Robinson Twp*, 283

Mich App 677, 689-690; 770 NW2d 421 (2009) (quotation marks and citation omitted).

### III. ANALYSIS

Plaintiff first argues that the trial court erred by granting summary disposition in favor of defendant on plaintiff's claim of tortious interference with a prospective economic advantage. I disagree. In my view, plaintiff failed to state a claim and otherwise failed to produce evidence of an intentional interference that caused a breach of the alleged business expectancy. In essence, plaintiff's claim is nothing more than dissatisfaction with the school district's ultimate choice of a contractor.

As noted by the majority, the requisite elements for tortious interference with advantageous business relationships or prospective economic relations are (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) an intentional interference causing a breach or termination of the relationship or expectancy, and (4) resulting damage to the party whose relationship or expectancy has been disrupted. At issue here are the first and third elements.

The first element requires proof of "the existence of a valid business relationship or the expectation of such a relationship between the plaintiff and some third party . . . ." *Blazer Foods, Inc v Restaurant Props, Inc*, 259 Mich App 241, 254; 673 NW2d 805 (2003). A valid business expectancy is one that is reasonably likely or probable, not merely hoped for. *First Pub Corp v Parfet*, 246 Mich App 182, 199; 631 NW2d 785 (2001), vacated in part on other grounds 468 Mich 101 (2003). The third element requires a plaintiff to prove "the intentional doing of a per se wrongful act or the doing of a lawful act

with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Badiee*, 265 Mich App at 367 (quotation marks and citation omitted). "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *Mino v Clio Sch Dist*, 255 Mich App 60, 78; 661 NW2d 586 (2003) (quotation marks and citation omitted).

### A. PLAINTIFF FAILED TO ESTABLISH THAT DEFENDANT IS AN INDEPENDENT THIRD PARTY

Although the trial court dismissed plaintiff's claim on the basis of MCR 2.116(C)(10), I would also conclude that an additional basis for dismissal exists under MCR 2.116(C)(8). "To maintain a cause of action for tortious interference, the plaintiff must establish that the defendant was a 'third party' to the contract rather than an agent of one of the parties acting within the scope of its authority as an agent." *Lawsuit Fin, LLC v Curry*, 261 Mich App 579, 593; 683 NW2d 233 (2004), citing *Reed v Mich Metro Girl Scout Council*, 201 Mich App 10, 13; 506 NW2d 231 (1993). The reason for this rule is common sense: An agent who is not acting solely on his or her own behalf, but is acting within the scope of an agency relationship, cannot be said to interfere with a business expectancy or contract because the agent's actions, as an arm of the principal, are imputed to the principal. Whether an agency relationship exists and the extent of its scope are questions of fact. See *Echelon Homes, LLC v Carter Lumber Co*, 261 Mich App 424, 434-435; 683 NW2d 171 (2004) rev'd on other grounds 472 Mich 192 (2005).

Defendant was not a third party to the prospective contract; rather defendant was acting as the school

board's agent. The contractual agreement between the school board and defendant directed defendant, at the school board's request, to assist the school board in the competitive-bidding process. Thus, defendant stood in a fiduciary relationship with the school board, and it was incumbent on defendant to act in good faith and in the school board's best interest when it assisted the school board in the selection of contractors for the project. Nothing in the record shows that defendant was acting solely for its own benefit, or otherwise outside its agency relationship with the school district, when it recommended that US Construction, instead of plaintiff, be awarded the project. And although there is some indication that Hoist had negative opinions of plaintiff's work, there is no indication that defendant's motives were strictly personal or that defendant would directly benefit from not recommending plaintiff. Accordingly, when defendant chose not to recommend plaintiff for the project, it did so as an agent of the school board rather than as an independent third party. As such, plaintiff's claim of tortious interference cannot lie against defendant. While this argument was never raised by defendant or addressed by the trial court, it alone provides a sufficient basis for dismissal and is an additional reason for affirming the trial court's decision.

### B. PLAINTIFF HAD NO VALID BUSINESS EXPECTANCY

Next, even assuming that defendant could be liable for tortious interference, I would conclude, contrary to the majority's position, that plaintiff lacked any business expectancy, valid or otherwise. Plaintiff merely stood in the position of a "disappointed bidder" on a construction contract. Michigan law makes clear that disappointed bidders for governmental contracts have

no action at law to recover lost profits, let alone any protected interest in being awarded a governmental contract. See *Talbot Paving Co v Detroit*, 109 Mich 657, 661-662; 67 NW 979 (1896). As our Supreme Court has stated: " 'The exercise of discretion to accept or reject bids [involving public contracts] will only be controlled by the courts when necessary to prevent *fraud, injustice or the violation of a trust*.' " *Leavy v City of Jackson*, 247 Mich 447, 450; 226 NW 214 (1929), quoting 3 McQuillin, Municipal Corporations (2d ed), § 1340, p 919 (emphasis added). Accordingly, there is no cause of action for damages in connection with alleged improprieties in the highly discretionary process for awarding public contracts absent fraud, injustice, or violation of trust.[3] This principle is consistent with public policy— competitive bidding is designed for the benefit of taxpayers, not bidders, *Lasky v Bad Axe*, 352 Mich 272, 276; 89 NW2d 520 (1958)—and with the relevant statute, which provides the school district with absolute and unfettered discretion in determining whether to award a contractor a project, MCL 380.1267.[4] As such, because a bidder has no valid business expectation, or interest in a prospective economic advantage, when it submits a bid to a governmental entity that has full discretion in the award process, like the school board in the instant case, it cannot sue a nonagent third party for tortious interference with that alleged expectancy.

---

[3] *EBI Detroit, Inc v Detroit*, unpublished opinion per curiam of the Court of Appeals, issued April 30, 2009 (Docket No. 277953). Although this case is not binding, MCR 7.215(C)(1), this Court may view it as persuasive, *Dyball v Lennox*, 260 Mich App 698, 705 n 1; 680 NW2d 522 (2004).

[4] Section 1267 of the Revised School Code, MCL 380.1 *et seq.*, establishes procedures that school districts must abide by when constructing a new school building. MCL 380.1267(6) requires bids to be read aloud at a public meeting and provides that "[t]he board, intermediate school board, or board of directors may reject any or all bids . . . ."

Indeed, when the ultimate decision to enter into a business relationship is, by statute, a highly discretionary decision, a plaintiff cannot establish that its "business expectancy" was a reasonable likelihood or possibility and not merely wishful thinking. *Trepel v Pontiac Osteopathic Hosp*, 135 Mich App 361, 377-381; 354 NW2d 341 (1984). This is not to say that a lawsuit for tortious interference with discretionary governmental action can never succeed as the majority notes; however, the category of cases in which such a suit may lie is very narrow and must involve fraud, injustice, or violation of trust. Stated differently, while a plaintiff has no business expectancy in a bidding process that vests absolute discretion in the governmental authority, a plaintiff does have a legitimate expectancy that the bid it submits will be evaluated fairly and openly and will be subject to the same or similar scrutiny as other bids, so that the plaintiff's bid stands on an even playing field with all other bids.

Because the instant matter involves a claim of tortious interference with a business expectancy allegedly stemming from the school board's competitive-bidding process, the question becomes, What degree of discretion was allowed to the school district and was it such a high degree that no business expectancy could flow from the bidding process? By statute, the competitive-bidding process here was highly discretionary in nature. The statute provides no limiting criteria, and thus it can be said the discretion granted to the school board in awarding a contract for construction is unfettered and the broadest discretionary authority possible. See MCL 380.1267. Further, the fact that plaintiff was not awarded the contract even after it had a full and fair opportunity to be heard at a public forum supports my conclusion that the award of the contract to US Construction was a highly discretionary governmental ac-

tivity in which "too many factors [were] in play to be able to reasonably infer that . . . plaintiff likely would have obtained the desired advantage." *Trepel*, 135 Mich App at 380. Accordingly, I would conclude, given the absolute discretion vested in the school district in regard to the bidding process, that plaintiff had no valid business expectancy; rather, it merely had an expectancy that its bid would be evaluated fairly and openly, absent any fraud, injustice, or violation of trust.

Implicit in this conclusion is my rejection of the majority's contrary position that the school district's discretion was limited. The bidding instructions clearly informed all bidders that the lowest bidder, or in fact any bidder, was not guaranteed to receive a contract. All the accompanying documentation related to the bidding process reiterated the board's full discretion to reject any and all bids. For example, the district's advertisement for bids provided, "Owner reserves the right to accept or reject any and all offers"; the instructions provided to bidders indicated that the board reserved the right to reject or accept any bids in its "best interest"; and, the FMP also contained language reserving the board's discretion to "reject any or all bids." I acknowledge, as the majority points out, that the FMP also mandates that the board select the "lowest responsible bidder." However, the majority's reliance on this language to conclude that the school district's discretion was limited, thereby creating a valid business expectancy in an exercise of discretionary governmental authority using principles of contract interpretation, is puzzling. The FMP did not have the force of law, and its distribution to all competing bidders did not create an enforceable contract or even an expectancy in a business relationship. Rather, in my view, the FMP is akin

to an employer's policy manual and merely informs contractors how the school board intends to proceed in the selection process.

Turning to the instant matter, because plaintiff had no valid business expectancy, plaintiff had to show that defendant interfered with its expectation that its bid would be treated fairly in the bidding process, which required plaintiff to show fraud, injustice, or violation of a trust. There is no evidence in the record substantiating fraud, let alone any allegations that defendant engaged in any fraudulent or unjust activity. Indeed, plaintiff even *admits* that in Cedroni's letter to the school district, he was simply attempting to substitute his own judgment for that of the school district. While plaintiff may believe its president's judgment to be superior to that of the school board, the statute endows the school board, not plaintiff, with the discretion to award contracts in the school board's best interest.

Further, I find the majority's reliance on *Joba Constr Co, Inc v Burns & Roe, Inc*, 121 Mich App 615; 329 NW2d 760 (1982), unpersuasive as support for its position that plaintiff had a valid business expectancy by virtue of its low bid. In that case, the defendant was the engineer for a project undertaken by the city of Detroit and, like defendant in this case, was to "evaluate bids made by contractors and make recommendations to the [city] as to which contractor should be awarded contracts." *Id.* at 624. Initially, the defendant recommended that the contract not be awarded to the plaintiff, the lowest bidder, because "it felt plaintiff was unqualified to perform the contract," and the contract was awarded to another bidder. *Id.* Subsequently, another contract was awarded to a different general contractor that "had designated plaintiff as its proposed excavation and piling subcontractor." *Id.* at 624-625. At

the defendant's direction, the plaintiff was removed as the subcontractor. *Id.* at 625. This Court held that the trial court had properly denied the defendant's motion for a directed verdict, concluding that the "plaintiff presented sufficient evidence to create a question of fact as to whether it was the lowest qualified bidder and thus had a legitimate expectancy in obtaining the contracts" at issue. *Id.* at 635.

While a superficial reading of *Joba Constr* suggests that it is applicable to this matter, I would conclude that its value as a guide to this Court is nonexistent. The *Joba Constr* Court never explained the nature of the evidence presented that gave rise to a legitimate business expectancy, and the Court never described what discretion, if any, the city of Detroit had to remove a subcontractor from the project. Thus, it is unclear whether the Court meant to suggest that simply being the lowest bidder in the bidding process is sufficient to establish a legitimate business expectancy or whether because the plaintiff had contracted with the general contractor and was already performing the role of a subcontractor it had some legitimate expectancy in the continuation of the same. Further, given the foregoing, the facts of *Joba Constr* are clearly distinguishable from the present matter. Here, plaintiff was never awarded a contract for the project through a general contractor and then subsequently removed from the project like the plaintiff in *Joba Constr*. Rather, the present matter is limited to the highly discretionary bidding process before a contract is awarded that school districts use when undertaking a school-construction project. Thus, the exact issue that was before the *Joba Constr* Court is not now before this Court. In any case, the decision in *Joba Constr* is not binding on this Court. Although a published opinion generally has precedential effect under the rule of stare decisis, MCR 7.215(C)(2), a rule of

law established in a published opinion issued before November 1, 1990, need not be followed, MCR 7.215(J)(1).

More persuasive and on point is the case of *Mago Constr Co v Anderson, Eckstein & Westrick, Inc*, unpublished opinion per curiam of the Court of Appeals, issued November 8, 1996 (Docket No. 183479).[5] In *Mago*, the plaintiff was the lowest bidder for a municipal contract. The defendant engineering consultant apparently recommended that the plaintiff's bid be accepted, but rescinded that recommendation when it was discovered that the plaintiff's bond was deficient, even though it turned out that every bidder's bond was nonconforming. *Id.* at 1-2. This Court affirmed the trial court's grant of summary disposition in favor of the defendant, ruling, in part, that the evidence did not establish that the plaintiff had a legitimate expectation of receiving the contract. *Id.* at 2. It explained:

> Where the ultimate decision to enter into a business relationship is a highly discretionary decision reposed within the structure of a governmental entity, it becomes more difficult for a plaintiff to prove that it had an expectancy of doing business with the governmental body. Here, the fact that [the second lowest bidder] was awarded the contract at a city council meeting after all interested parties were given a chance to be heard supports the view that the award of the contract was a highly discretionary governmental activity in which "too many factors [were] in play to be able to reasonably infer that . . . plaintiff would have obtained the desired advantage." Moreover, the bidding instructions clearly informed plaintiff that the lowest bidder was not guaranteed to receive the water main improvement contract. Lastly, the fact that plaintiff submitted a nonconforming bid should have negated any

---

[5] Again, while I recognize this case is not binding precedent, MCR 7.215(C)(1), I do view it as persuasive. See *Dyball*, 260 Mich App at 705 n 1.

expectation that it might have had regarding the possibility of receiving the contract. [*Id.* at 3 (citations omitted).]

Apart from the bond issue, *Mago* is identical to this case. Plaintiff knew from the outset that the lowest bidder was not guaranteed to be awarded the contract, that the selection of the winning bidder depended on the evaluation of numerous criteria, and that the decision was made at a public meeting at which interested parties, including plaintiff, were permitted to speak.

An additional case I find persuasive is *EBI-Detroit, Inc v Detroit*, 279 Fed Appx 340 (CA 6, 2008), in which the plaintiff was the low bidder on a project commissioned by the Detroit Water and Sewer Department (DWSD) and its bid was rejected. *Id.* at 343. The plaintiff filed suit in the Wayne Circuit Court, and the defendants removed it to federal court. Regarding the plaintiff's state-law claim for tortious interference against two of the DWSD's directors, the appellate court held that the plaintiff did not have a valid business expectancy. *Id.* at 352-353. It explained:

[H]owever one describes EBI's relationship with DWSD, it is not the kind of relationship that can support a tortious interference claim. Michigan courts have already rejected the idea that a disappointed bidder has a valid business expectancy in a potential government contract. *Timmons v. Bone*, [unpublished opinion per curiam of the Court of Appeals, issued April 23, 2002 (Docket No. 228942)] 2002 WL 745089, at *2 (Mich.Ct.App. April 23, 2002). We agree, and note that holding otherwise would give any low responsive bidder an immediate business expectancy in the government contract at issue. EBI had a "unilateral hope" of winning the contract, nothing more, so its tortious interference claim cannot proceed. [*Id.*]

In summary, given that the school board expressly reserved the right to reject any bid under MCL 380.1267, I conclude that while plaintiff's status as the

lowest bidder created the mere *possibility* that it would be in contention to be awarded the contract, it did not create a reasonably likely or probable expectation that it would, in fact, be awarded the contract. Because plaintiff had no business expectancy in the highly discretionary bidding process and it only had an expectancy that its bid would be treated fairly, it was required to come forward with some evidence of fraud, injustice, or violation of trust. It failed to do so, and therefore the trial court properly granted defendant summary disposition under MCR 2.116(C)(10).

### C. PLAINTIFF DID NOT ESTABLISH INTENTIONAL INTERFERENCE

Even assuming that the majority's framework of analysis is correct, i.e., that plaintiff had some valid business expectancy, I would nonetheless conclude that plaintiff's claim fails on the third element necessary to establish a claim of tortious interference. The claim requires proof that the defendant intentionally interfered with the existence of a valid business relationship or expectancy and that the interference induced or caused a breach or termination of the relationship or expectancy. *BPS Clinical Laboratories v Blue Cross & Blue Shield of Mich (On Remand)*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996); *Lakeshore Community Hosp, Inc v Perry*, 212 Mich App 396, 401; 538 NW2d 24 (1995). In addition to being intentional, the interference must be improper, i.e., illegal, unethical, or fraudulent. *Trepel*, 135 Mich App at 374. To prove that the defendant acted improperly, the plaintiff must show the intentional doing of an act that is wrongful per se or the intentional doing of a lawful act with malice and unjustified in law. *Advocacy Org for Patients & Providers v Auto Club Ins Ass'n*, 257 Mich App 365, 383; 670 NW2d 569 (2003). "A wrongful act per se is an act that is

inherently wrongful or an act that can never be justified under any circumstances." *Prysak v R L Polk Co*, 193 Mich App 1, 12-13; 483 NW2d 629 (1992). If the plaintiff relies on the intentional doing of a lawful act done with malice and unjustified in law, the plaintiff "must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *BPS Clinical Laboratories*, 217 Mich App at 699. The defendant does not act improperly when its actions are motivated by legitimate business reasons. *Id*. Plaintiff does not and did not meet this burden; it has shown neither interference nor causation.

### 1. INTENTIONAL INTERFERENCE

Plaintiff contends that a question of fact existed regarding whether defendant provided the school board false information. I disagree. Plaintiff fails to identify any evidence in the record substantiating this claim. Plaintiff's argument seems to rely on Hoist's notes from the reference checks, which related to projects plaintiff worked on. However, there is no evidence in the record indicating that Hoist's notes contained false reports. Noticeably absent from the record is any affidavit or proof that Hoist's notes were made up, slanted, or created out of whole cloth. In fact, plaintiff has never asserted that the comments recorded in Hoist's notes were not actually made. Indeed, Cedroni's letter to the school district made no such allegations, but simply asserted that he disagreed with the references. Plaintiff chose not to submit any affidavits from these references asserting that they had provided glowing references of plaintiff's work or that they never made the statements recorded in Hoist's notes. A party cannot create a question of fact to avoid summary disposition by mere allegations or promises that a claim will be supported

by evidence at trial. *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999); *Barnard Mfg Co, Inc v Gates Performance Engineering, Inc*, 285 Mich App 362, 377; 775 NW2d 618 (2009). Plaintiff's reliance, as well as the majority's reliance, on Cedroni's letter to create a question of material fact is simply erroneous because the letter contains inadmissible hearsay within hearsay. *Nuculovic v Hill*, 287 Mich App 58, 62; 783 NW2d 124 (2010) (noting the well-established rule that when reviewing a motion to dismiss based on MCR 2.116(C)(10), only evidence that is admissible is considered).

Further, it is obvious from the record that plaintiff and defendant have had disagreements in the past while working together on previous projects and that their relationship was contentious at times. Considering that the parties worked together on complex, large, and costly construction projects, it is not difficult to imagine professional disagreements occurring. Plaintiff's attempt to blame defendant for the professional disagreements, however, does not create a legitimate question of fact, absent some other substantiating evidence, that defendant acted on improper motives. As noted, a plaintiff must identify specific affirmative acts that corroborate the alleged improper motive. *BPS Clinical Laboratories*, 217 Mich App at 699. A review of the record, in a light most favorable to plaintiff, reveals that this evidence is lacking. At best, the most that can be inferred is that Hoist had a negative opinion of plaintiff's work on the basis of prior experience. Reporting that information to the school board, however, was not malicious or wrongful conduct; rather, defendant was merely acting within its capacity to make recommendations to the school district, as was required under its contract with the school district. There simply is no question that defendant's actions were justified as

actions based on a legitimate business decision. Accordingly, plaintiff has failed to establish any question of material fact that defendant acted improperly.

### 2. CAUSATION

Even if defendant had acted improperly, however, plaintiff has failed to show that this allegedly improper conduct actually interfered with plaintiff's supposed business expectancy. Defendant's recommendation was but one factor that the school district was to consider in determining which contractor to award the contract. After receiving defendant's recommendation and Cedroni's letter, a district committee considered the recommendation and the letter. The committee then made a recommendation to the school board, which, in turn, consistenly with the FMP, considered a number of responsibility criteria, defendant's recommendation, and Cedroni's letter. As noted, the responsibility criteria take into account a wide variety of information relating to a particular contractor, such as projects completed during the last three years, experience with projects similar to those being bid on, and references from third persons that have hired the contractor. Discretion was vested in the board to select the contractor that it viewed to be qualified to perform the job. The school board ultimately selected the second lowest bidder, US Construction, which at that time had an active contract with the school district and was performing well. In other words, defendant's recommendation was only one factor taken into account when the board made its determination. Defendant has presented no evidence showing that the board relied solely on information submitted by defendant or that, absent the recommendation, plaintiff would have been awarded the contract. Accordingly, plaintiff has also failed to

establish causation. See *Barnard Mfg*, 285 Mich App at 377 ("[A] party 'may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided [in MCR 2.116], *set forth specific facts* showing that there is a genuine issue for trial.' ") (citation omitted).

IV. CONCLUSION

In my view, the trial court properly granted summary disposition for defendant. Plaintiff never established that defendant was an independent third party. Rather, in recommending that the school board reject plaintiff's bid, defendant was acting as an agent of the school board. Thus, plaintiff failed to state a claim on which relief could be granted. *Reed*, 201 Mich App at 13. Even if this were not the case, I would conclude that plaintiff lacked any valid business expectancy. The school board's decision was highly discretionary and, by statute, it had broad and unfettered discretion to reject any or all bidders. Thus, none of the bidders in the bidding process had any prospective advantage or business expectancy; rather, each of their interests was limited to an expectancy that the bidding process would be fair and free of fraud. To sustain a claim of tortious interference on this basis, a party must show fraud, injustice, or violation of trust in the bidding process. Plaintiff made no such showing here. Even if the majority's framework of analysis were correct, plaintiff failed to show that defendant's conduct was malicious or wrong or that defendant's allegedly wrongful conduct caused plaintiff to lose the award of the contract. Plaintiff is merely a disappointed bidder in the competitive-bidding process that believes its judgment should be substituted for that of the governmental agency. The majority's opinion sanctions this position. In effect, it will allow all

disgruntled bidders for governmental contracts to state a claim of intentional interference with a business expectancy against the government's agent based on the agent's negative professional opinion of the claimant. Unfortunately, the majority has failed to see this lawsuit for what it really is: plaintiff's attempt to punish or obtain damages from defendant for expressing its opinion that plaintiff performed poorly on previous projects.

I would affirm.